**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| HCONTROL HOLDINGS LLC, OTI FIBER LLC, RURAL BROADBAND SYSTEMS, LLC, COMMUNITY FIBER LLC, and MARIO M. BUSTAMANTE, solely in his capacity as Sellers' Representative,<br><br>           Plaintiffs/Counterclaim<br>           Defendants,<br><br>   v.<br><br>ANTIN INFRASTRUCTURE PARTNERS S.A.S. and OTI PARENT LLC,<br><br>           Defendants/Counterclaim<br>           Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2023-0283-KSJM |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted:  May 22, 2023
Date Decided:  May 29, 2023

Richard I. G. Jones, Jr., Michael W. McDermott, Harry W. Shenton IV, BERGER HARRIS LLP, Wilmington, Delaware; Patrick J. Smith, Brian T. Burns, Sean McMahon, CLARK SMITH VILLAZOR LLP, New York, New York; *Attorneys for Plaintiffs-Counterclaim Defendants HControl Holdings LLC, OTI Fiber LLC, Rural Broadband Systems, LLC, Community Fiber LLC, and Mario M. Bustamante.*

William M. Lafferty, Thomas W. Briggs, Jr., Miranda N. Gilbert, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Anna G. Rotman, P.C., KIRKLAND & ELLIS LLP, Houston, Texas; Stefan Atkinson, P.C., Mike Rusie, KIRKLAND & ELLIS LLP, New York, New York; Zack C. Ewing, KIRKLAND & ELLIS LLP, Austin, Texas; *Counsel for Defendants-Counterclaim Plaintiffs Antin Infrastructure Partners S.A.S. and OTI Parent LLC.*

**McCORMICK, C.**

On December 3, 2022, Antin Infrastructure Partners S.A.S. ("Antin") entered into a merger agreement (the "Merger Agreement") to acquire a group of privately held Florida broadband companies, collectively referred to as "OpticalTel," which were formed by and affiliated with Mario Bustamante.[1] The Merger Agreement contained capitalization representations concerning the owners of OpticalTel, and Buyers negotiated for a bring-down provision requiring that those representations be accurate in all respects at the time of closing.

After the parties entered into the Merger Agreement, a former OpticalTel employee named Rafael Marquez came out of the woodwork claiming an ownership interest in an OpticalTel subsidiary based on a 2004 software development agreement. Marquez, a seemingly colorful character and a skilled shakedown artist, embarked on a campaign of disruption to extract as much value from Bustamante and Sellers as possible. As part of this campaign, he made direct contact with Buyers and Buyers' counsel, banker, and financing partners, claiming to be a co-founder of OpticalTel. Buyers investigated Marquez's claims. Although both Sellers and Buyers rightly concluded that Marquez was dramatically overstating the value of his interest, Buyers also determined that Marquez's claim had some factual basis. Buyers asked Sellers to settle with Marquez, but Marquez's

---

[1] For convenience, this decision refers to the OpticalTel parties to the Merger Agreement as the "Sellers" and the Antin parties to the Merger Agreement as the "Buyers." The Sellers are: HControl Holdings LLC, OTI Fiber LLC, Rural Broadband Systems, LLC, Community Fiber LLC, and Mario Bustamante in his capacity as Sellers' representative. The Buyers are Antin Infrastructure Partners S.A.S. and OTI Parent LLC. *See* C.A. No. 2023-0283-KSJM, Docket ("Dkt.") 93, Pre-Trial Stipulation and Order ("PTO") at 1.

unreasonable demands made that unachievable. Ultimately, Buyers noticed a breach of the capitalization representations based on Marquez.

Marquez's campaign of disruption stirred up other potential capitalization issues. In one of his unsolicited calls to Antin's senior partner, Marquez warned: "I am not the only one!" Antin interpreted this to mean that there might be other former employees who would claim an ownership interest in OpticalTel and began investigating that suspicion. That investigation unearthed another former employee, Wajid Iqbal, who claimed to hold options, warrants, and a 5% interest in one of the OpticalTel entities. Sellers denied that Iqbal had any valid claims but attempted to settle with Iqbal. These efforts were unsuccessful. Buyers took the position that Iqbal's interests rendered the capitalization representations inaccurate and noticed a breach on this independent basis.

The Marquez issue further snowballed into additional disputes between Buyers and Sellers. Sellers responded to the notice of breach by asking Buyers for permission to contact other potential acquirers. Buyers took this to mean that Sellers were already contacting backup bidders, claimed that such efforts violated the no-shop provision in the Merger Agreement, and ultimately noticed a breach of the no-shop.

Sellers also attempted to cure the Marquez breach, but those efforts gave rise to other litigable issues. Without first obtaining Buyers' consent, Sellers transferred the software assets of the OpticalTel subsidiary in which Marquez claimed an interest to a parent company for a value determined by the Sellers. Sellers then filed to dissolve the subsidiary with Florida's Department of State. The subsidiary placed in trust an amount

2

that Sellers believed sufficient to satisfy Marquez's claims, and Bustamante agreed to indemnify the subsidiary for any damages recovered by Marquez that exceeded that amount. Sellers argued that this cured Marquez's claim by reducing it to a monetary claim. Buyers denied that the transfer-dissolution plan cured the Marquez issue, claimed that the transfer, dissolution, and indemnity agreement violated multiple interim covenants in the Merger Agreement, and served a notice of breach on that basis.

Ultimately, Buyers terminated the Merger Agreement based on Sellers' breaches of the Merger Agreement. In anticipation of termination, Sellers filed this suit for specific performance. They claim that Buyers breached the Merger Agreement by wrongfully terminating it and by failing to use best efforts to close the merger. To support their claim for breach of the best-efforts provision, Sellers took the position that it became impossible to settle with Marquez because Buyers attempted direct contact, giving him greater leverage in negotiations. Buyers counterclaimed for breach of the capitalization representations, interim covenants, and no-shop provisions.

With Buyers' debt commitment expiring on June 9, 2023, the parties moved expeditiously toward a three-day trial in May 2023, and requested a prompt posttrial decision.[2] This decision finds that the Marquez issue rendered the capitalization

---

[2] *See* PTO ¶ 135; Dkt. 147 (May 26, 2023 letter from counsel). The parties are to be commended for the efficiency with which they proceeded to trial and for avoiding any discovery disputes in the process. To issue a posttrial decision in time to permit potential appellate review and final disposition of this action before the debt commitment expired, I wrote this decision quickly and cut the editing process short. As a consequence, aspects of this decision probably lack polish (please forgive the typos) and the extended treatment that the issues deserve.

representations inaccurate, and that Sellers failed to cure the issue. Sellers breached the Merger Agreement on this basis, rendering Buyers' termination valid. The parties failed to prove any of their other claims or counterclaims.

It bears noting that the financial value of the Marquez issue is minor relative to the deal value, as Buyers concede. One would think that Buyers could protect themselves from the economic risk of those claims through an escrow arrangement at closing, which would supplement the protections of the broad special indemnity Buyers secured in the Merger Agreement. Apparently, however, Buyers do not want the hassle. In an ironic twist, Buyers—who previously enjoyed a reputation as a reliable deal partner likely to provide a target with deal certainty—say that that their business reason for backing out of the deal is the concern that Marquez himself posed reputational risks post-closing.

Ultimately, it is not for this court to question the business wisdom of Buyers' decision to terminate. Buyers negotiated for the ability to terminate if the capitalization representations were not accurate in all respects, and this decision enforces that right. Judgment is entered in favor of Buyers.

## I.    FACTUAL BACKGROUND

Trial took place over three days. As reflected in the Joint Schedule of Evidence submitted by the parties, the record comprises 598 joint trial exhibits, trial testimony from eleven fact and two expert witnesses, deposition testimony from 16 fact and two expert

witnesses, and stipulations of facts in the pre-trial order.[3]  These are the facts as the court finds them after trial.

## A.     OpticalTel

OpticalTel is a Florida broadband provider founded by Bustamante in 2003.[4] Currently, OpticalTel is structured as four top-level limited liability companies formed under Florida law: HControl Holdings LLC; OTI Fiber LLC; Rural Broadband Systems, LLC; and Community Fiber LLC.[5]  HControl Holdings holds three relevant operating entities: HControl Corporation, which developed and held Sellers' back-office software; Optical Telecommunications, Inc., which was the government-regulated utility that obtained the necessary certifications from the state of Florida; and Community Services LLC, which owned special-purpose entities for each community in which Sellers operated.[6]  OpticalTel used OTI Fiber, Rural Broadband, and Community Fiber to enter contracts on behalf of and obtain loans for HControl Holdings.[7]

---

[3] *See* Dkt. 140, Joint Schedule of Evid.  This decision cites to: trial exhibits (by "JX" number); the trial transcript, Dkts. 134–136 (by "Trial Tr. at" page, line, and witness); the deposition transcripts of Garrett Baker, Mario Bustamante, Gregory Campanella, Chris Clark, Mark Dennis Clark, Mark Crosbie, Richard Edlin, Kevin Genieser, Kemal Hawa, Wajid Iqbal, Rafael Marquez, Juan O'Naghten, Ravit Purohit, Michael Pusateri, Marc Reiser, Luis Rodriguez, Steven Davidoff Solomon, and Christopher Turek (by the deponent's last name and "Dep. Tr. at" page and line); and stipulations of fact in the Pre-Trial Stipulation and Order.

[4] PTO ¶ 42; Trial Tr. at 100:1–101:12 (Bustamante).

[5] JX-82 at 7; PTO ¶¶ 34–37.

[6] Trial Tr. at 117:7–20 (Bustamante); Bustamante Dep. Tr. at 22:11–23; JX-82 at 7.

[7] O'Naghten Dep. Tr. at 153:23–154:18.

The Merger Agreement refers to the four top-level entities as the "Purchased Entities."[8] The Purchased Entities and their subsidiaries comprise OpticalTel, sometimes called the "Company" or the "Company Group."[9] Bustamante and his affiliated trusts own a majority of the interests in each of the four Purchased Entities.[10]

Bustamante served as the Company Group's CEO for most of the Company's existence.[11] In 2021, Bustamante stepped down from his role as CEO[12] and elevated Luis Rodriguez from President and Chief Operating Officer to that position.[13]

One four-person Board of Directors oversaw the entire Company Group.[14] Bustamante served as Executive Chairman and selected the remaining directors from his friends and acquaintances.[15] The three other directors were Juan O'Naghten, Godfrey Thomas, and Tiffany Cant.[16] O'Naghten served as HControl Holdings' outside general counsel, and he had been outside general counsel for Bustamante's other ventures since the

---

[8] JX-160 ("Merger Agreement") at 5.

[9] *Id.* §§ 1.01, 4.02.

[10] Trial Tr. at 187:8–14 (Bustamante).

[11] *Id.* at 179:1–3 (Bustamante).

[12] *Id.* at 187:5–7 (Bustamante).

[13] *Id.* at 113:18–114:8 (Bustamante); *id.* at 289:6–10 (Rodriguez).

[14] *See, e.g.,* JX-37 (OTI Fiber Operating Agreement) at 1 ("[T]he company and HControl shall at all times be governed and managed by the same Board of Directors, Manager, and officers."); JX-48 (Rural Broadband Operating Agreement) at 2 (same).

[15] Trial Tr. at 239:12–13 (Bustamante) ("The board is four guys that know each other."); *id.* at 247:3–5 (referring to his "three friends who are sitting on the board").

[16] *See* JX-55 (listing board members).

early 2000s.[17] Thomas and Cant were early investors in HControl Holdings.[18] Bustamante added a new acquaintance, Mark Clark, to the board in an advisory and non-voting capacity in July 2022.[19] Bustamante, O'Naghten, and Mark Clark played an active role in the sale process, and all three testified at trial.

### B. OpticalTel Launches A Sale Process.

In early 2022, OpticalTel launched a sale process and engaged Lazard Freres & Co. LLC ("Lazard") as its financial advisor and Latham & Watkins LLP ("Latham") as its legal advisor.[20] Over fifty potential buyers signed non-disclosure agreements, and thirteen potential buyers submitted first-round bids.[21]

Antin is a private-equity firm formed under French law that focuses on infrastructure investments.[22] On July 28, 2022, Antin executed a non-disclosure agreement to facilitate diligence.[23] Antin engaged Greenberg Traurig, LLP ("Greenberg") as its legal advisor and TD Securities as its financial advisor.[24] Antin believed that OpticalTel

---

[17] O'Naghten Dep. Tr. at 11:20–13:2.

[18] Rodriguez Dep. Tr. at 84:7–18; Bustamante Dep. Tr. at 143:3–14.

[19] Trial Tr. at 494:15–19 (M. Clark).

[20] PTO ¶¶ 43–44.

[21] JX-74 at 2.

[22] PTO ¶ 39.

[23] JX-56.

[24] PTO ¶ 46; Crosbie Dep. Tr. at 66:3–20.

presented an attractive acquisition opportunity given market conditions, its quality management team, and opportunities for growth within its market.[25]

On August 18, 2022, Antin submitted a non-binding indication of interest on behalf of Antin and its affiliates (Buyers) offering to buy the Company for $216 million.[26] At Lazard's prompting, Buyers bumped the offer to $225 million on August 24 to make it to the second round of bidding.[27]

As bidding entered the second round, Buyers and another firm emerged as the leading bidders.[28] At Sellers' request, Buyers submitted a non-binding "refresh bid" of $230 million.[29] Although the competing bidder offered a higher base price of $235 million, Sellers' management identified Buyers as its preferred bidder, and Lazard pushed in favor of Buyers.[30] As Mark Clark explained during trial, Sellers preferred Buyers because they perceived them as offering deal certainty.[31] Buyers enjoyed that reputation and understood the value of offering certainty at the transactional table.[32]

---

[25] Trial Tr. at 890:12–891:22 (Genieser).

[26] JX-69.

[27] JX-71; Trial Tr. at 124:19–125:15 (Bustamante).

[28] Trial Tr. at 126:18–127:8 (Bustamante).

[29] JX-87; JX-92.

[30] Trial Tr. at 126:18–127:8 (Bustamante).

[31] *Id.* at 474:11–475:11 (M. Clark) ("Certainty is important. These are high-stakes transactions. . . . And you want to make sure that, when you do it, you pick the right party and that that party is capable of closing.").

[32] *Id.* at 923:12–24 (Genieser) (describing the value placed on deal certainty); *id.* at 475:15–476:2 (M. Clark) (describing Antin's reputation for deal certainty).

On November 4, Buyers submitted another non-binding offer to buy the Company for $230 million, along with a potential earnout payment of $10 million.[33] Later on November 4, Lazard asked Buyers and the other finalist to increase their offers to $255 million, inclusive of potential earnouts.[34] Whoever accepted first would be granted exclusivity.[35] Buyers accepted first.[36] Sellers and Buyers entered into an exclusivity agreement on November 5.[37]

### C. The Parties Enter Into The Merger Agreement.

Sellers and Buyers executed the Merger Agreement on December 3, 2022.[38] The Merger Agreement provides for the merger of the Purchased Entities into four of Buyers' "Merger Subs,"[39] for a "Base Purchase Price" of $230 million.[40] Through two earnouts payable if the Company met certain milestones post-closing, Sellers could be paid up to an additional $30 million.[41] The parties also contemplated that, post-closing, Rodriguez

---

[33] JX-94.

[34] JX-103; JX-93.

[35] JX-99.

[36] JX-101 (Bustamante writing: "I can't express how happy I am with this result considering the state of the market. . . . [Buyers] were clearly the most competent team of all the bidders.").

[37] JX-100.

[38] PTO ¶ 62; *see also* Merger Agreement.

[39] Merger Agreement § 2.01.

[40] *Id.* § 1.01.

[41] *Id.* § 2.06.

would continue to serve as CEO and Bustamante would continue to serve on OpticalTel's Board of Directors.[42]

During the exclusivity period, the parties exchanged draft transactional documents while continuing diligence efforts. Using Latham's "auction draft" as a starting point,[43] the parties exchanged seven markups.[44] In briefing, the parties identified aspects of that drafting history as relevant to this litigation.

Greenberg sent Buyers' first markup of the auction draft to Latham on November 11, 2022.[45] Greenberg's edits to two provisions featured heavily in the parties' briefing. Those two provisions are: Section 4.02, where Sellers made representations and warranties concerning who owned the businesses being sold (the "Capitalization Representations");[46] and Section 7.01(a), where Sellers agreed that all "Fundamental Representations," defined

---

[42] Trial Tr. at 791:16–23 (Reiser); Merger Agreement § 6.08(a).

[43] JX-109 (auction draft). An "auction draft" is a form of agreement prepared by the sellers and made available to buyers, typically through the data room. Trial Tr. at 9:5–9 (Purohit).

[44] PTO ¶¶ 55–61; *see* JX-107 (Greenberg's Nov. 11 markup to the auction draft); JX-114 (Latham's Nov. 15 markup to the Nov. 11 draft); JX-121 (Greenberg's Nov. 22 markup to the Nov. 15 draft); JX-124 (Latham's Nov. 23 markup to the Nov. 15 draft); JX-127 (Latham's Nov. 25 further markup to the Nov. 15 draft); JX-128 (Greenberg's Nov. 28 markup to the Nov. 23 and Nov. 25 drafts); JX-134 (Latham's Nov. 29 markup to the Nov. 28 draft).

[45] JX-107.

[46] Trial Tr. at 13:9–13 (Purohit) ("You would like to understand the capitalization of the company, who owns what, and if you need to get somebody's vote or you know who the ownership is of the company that you're stepping into post-closing."); *id.* at 699:15–18 (Reiser) ("[T]he purpose of the capitalization representation is for the buyer to get representations regarding the kind of interests in the company group entities."); *id.* at 400:23–401:2 (Solomon) ("If you're buying a house, you want to know that you're buying title to the house, and so this is what assures you that you're actually getting that house.").

to include the Capitalization Representations, would be true and correct at closing (the "Bring-Down Provision").

In its November 11 markup of the Capitalization Representations, Greenberg inserted the defined term "Equity Securities," which is quoted fully in the legal analysis.[47] As revised, the Capitalization Representations state that: "The Units constitute the only outstanding Equity Securities of the Purchased Entities" and "[a]ll of the Equity Securities of each of the Subsidiaries of the Purchased Entities are wholly-owned by the applicable Purchased Entity or one of the applicable Purchased Entity's Subsidiaries."[48] Sellers accepted this change and the definition of Equity Securities,[49] which remained in the final agreement.[50]

Importantly, Buyers did not alter the last sentence in the Capitalization Representations, except to insert the defined term Equity Securities in the place of the undefined term "equity securities." The untouched portions of the auction draft remained the same through each round of markups.[51] In the final draft, the Capitalization Representations provide that "[t]here are no outstanding . . . phantom equity, . . . or other similar rights, agreements, arrangements, undertakings or commitments of any kind to

---

[47] JX-107 at 12–13.

[48] *Id.* at 32.

[49] JX-114.

[50] Merger Agreement § 4.02.

[51] *Compare* JX-107, JX-114, JX-121, JX-124, JX-127, JX-128, *and* JX-134, *with* Merger Agreement § 4.02.

which any such member of the Company Group is a party obligating it to . . . grant, extend or enter into any . . . phantom stock."[52]  Due to this language, the Capitalization Representations extended beyond the definition of Equity Securities and cover phantom equity, among other things.

In its November 11 markup to the Bring-Down Provision, Buyers struck Sellers' *de minimis* qualifier, which provided that the Fundamental Representations (including the Capitalization Representations) "shall be true and correct in all respects (except failures to be true and correct as are, individually and in the aggregate, *de minimis* in nature)."[53]  By striking the *de minimis* qualifier to secure a "flat" Bring-Down, Buyers required Sellers to maintain their Fundamental Representations at closing in all respects.[54]  The parties went back and forth on this provision in subsequent drafts.  Sellers reinserted the *de minimis* qualifier twice, and Buyers struck it twice.[55]  Buyers ultimately prevailed on this point, and the final draft contained language requiring that the Fundamental Representations be "true and correct in all respects" at the time of closing.[56]

---

[52] Merger Agreement § 4.02.

[53] JX-107 at 82.

[54] Trial Tr. at 622:14–623:5 (Turek); *id.* at 713:2–9 (Reiser).

[55] *Compare* JX-114 at 85 (Latham's Nov. 14 markup) *and* JX-124 at 84 (Latham's Nov. 23 markup), *with* JX-121 at 85 (Greenberg's Nov. 22 markup) *and* JX-128 at 84 (Greenberg's Nov. 28 markup).

[56] Merger Agreement § 7.01(a).  Two categories of Fundamental Representations, neither relevant to this dispute, were exempted from the *de minimis* qualifier.  *See id.*

Simultaneously, Buyers continued diligence into Sellers' businesses. Diligence into Sellers' capitalization table prompted other revisions to the Merger Agreement that were discussed at length in the parties' briefing.

On November 11, Greenberg requested a "detailed capitalization table" from Sellers, and Bustamante provided one on November 14 that was prepared by Sellers' accountant.[57] There were discrepancies between the November 14 table and the prior version of the table that Sellers provided through the data room.[58] These discrepancies led Buyers to add a new request to the diligence tracker concerning "Equity Ownership / Capitalization."[59]

Specifically, on November 15, Buyers asked Sellers to confirm that certain subsidiaries were wholly owned and further requested: "[Q558] Please provide copies of all documentation related to the issuances and/or transfers of shares of HControl Holdings and the [Purchased] Entities."[60] Lazard described these as "the highest priority requests"

---

[57] JX-106 at 48.

[58] JX-111 (capitalization table as of 11/14/23); Trial Tr. at 128:22–129:21 (Bustamante) (explaining that "there was a capitalization table that was in the data room from early in the process," but when Buyers asked for a capitalization table during the exclusivity period, Bustamante provided a table that he obtained from the Company Group's tax accountant, and this table did not reflect a few transactions); *id.* at 631:20–632:2 (Turek).

[59] JX-115.

[60] *Id.*

and "items that [Buyers] would like addressed asap."[61]  On November 16, Sellers confirmed that the subsidiaries were wholly owned but questioned the need for Q558.[62]

About a week after circulating its initial markup, Buyers (through TD Securities) sought to "emphasize the priority" of obtaining documentation about share transfers,[63] a request that, by November 21, TD Securities described as "massively important" and as "the most significant outstanding request."[64]  A Greenberg deal lawyer testified that the documentation Sellers provided in response was "inadequate."[65]  While not unusual for a family-owned business like Sellers to have less-than-perfect recordkeeping,[66] the capitalization questions led Buyers to negotiate for particular protections.

Through a November 22 markup, Greenberg proposed two additional changes driven by diligence into Sellers' capitalization table.

---

[61] *Id.*

[62] JX-117.

[63] JX-131 at 11; *see also* JX-118 (Nov. 21 request, identifying it as "the most significant outstanding request" and "massively important to tying out diligence on the legal side"); JX-130 (Nov. 28 request).

[64] JX-130.

[65] Hawa Dep. Tr. at 25:18–28:10; *see also* Trial Tr. at 656:12–14 (Turek) ("I think we just wanted to understand why we couldn't find them.  It's something we typically would see in transactions like this.").

[66] Purohit Dep. Tr. at 105:24–106:17; *see also* Trial Tr. at 286:20–22 (Bustamante) ("Q. And sometimes you would scan documents and then throw away the original?  A.  Yes."); *id* at 287:22–288:1 (Bustamante) ("Q.  And there was no central repository that the company had to maintain corporate documents?  A.  No.  Like I said, depending on the document, it's supposed to be in a certain place.").

First, Greenberg proposed changing the transaction's structure from a purchase and sale agreement to a merger.[67] A merger addresses capitalization concerns by effectively reducing claims of shareholders who do not sign a sale agreement to one for money damages, rather than a claim of ownership in the new entity, thereby ensuring that the buyer obtains 100% of the shares in the merged entity.[68] Sellers agreed to this change.[69]

Second, Greenberg proposed a special indemnity, inserted as a new Section 9.03, requiring Bustamante to personally indemnify Buyers for any costs or damages arising from third-party claims relating to any breach of the Capitalization Representations (the "Special Indemnity").[70] Sellers also accepted this change.[71] As Sellers' attorney testified at trial, the Special Indemnity provided a broad "dollar one, uncapped, untimed indemnity" that was extremely favorable to Buyers.[72]

These changes, coupled with the other terms of the Merger Agreement, addressed Buyers' concerns regarding capitalization issues that arose in diligence.[73] On December 1, 2022, Buyers sought approval for the deal from their Investment Committee.[74] The deal team reported that questions regarding Sellers' capitalization remained unanswered, but

---

[67] JX-121.

[68] *See* Trial Tr. at 16:10–21 (Purohit); *id.* at 626:9–22 (Turek); *id.* at 707:24–708:9 (Reiser).

[69] JX-124.

[70] JX-121.

[71] JX-124

[72] Merger Agreement § 9.03; Trial Tr. at 19:1–6 (Purohit).

[73] Trial Tr. at 758:2–5 (Reiser); *see also id.* at 632:6–21, 709:6–9 (Turek).

[74] JX-142.

"[a]ny issues that came up during diligence were subsequently addressed in the Merger Agreement."[75] They further explained that they completed confirmatory diligence "without finding any material gating issues."[76] The Investment Committee unanimously approved the deal.[77]

In addition to the deal's features discussed above—the Capitalization Representations, the Bring-Down Provision, the structure as a merger, and the Special Indemnity—the final Merger Agreement contained interim operating covenants. Among other things, these covenants: required Sellers to operate the Company in the "Ordinary Course of Business" and "preserve intact the business organizations;"[78] prohibited Sellers from entering certain types of agreements with affiliates;[79] and prohibited Sellers from dissolving a material subsidiary within the Company Group.[80] The final Merger

---

[75] *Id.* at 4.

[76] *Id.*

[77] Trial Tr. at 899:15–20 (Genieser).

[78] Merger Agreement § 6.01(a) ("During the Interim Period . . . each Seller shall, and shall cause the Company Group to . . . conduct its and their respective Businesses in the ordinary Course of Business in all material respects.").

[79] *Id.* § 6.01(b)(xi) ("Seller shall not, and shall not permit any member of the Company Group to . . . enter into or modify any Contract with any Affiliate of the Company Group (other than within the Company Group)[.]").

[80] *Id.* § 6.01(b) (prohibiting Sellers from adopting a plan of dissolution of any member of the Company Group, "other than intra-company mergers or a dissolution of immaterial Subsidiaries").

16

Agreement also contained a provision requiring that both sides make best efforts to consummate the merger[81] and a no-shop provision.[82]

For Buyers to validly terminate under the Merger Agreement due to Sellers' breach, Buyers could not be "in material breach of any of its representations, warranties, covenants or other agreements."[83]

The Merger Agreement sets an "Outside Date" of June 3, 2023, but the Outside Date is suspended where—as here—Sellers seek specific performance in defined "Legal Proceedings."[84] Buyers' debt financing commitment, however, would expire five business days after the Outside Date, or June 9.[85]

### D. A Former Company Employee, Rafael Marquez, Claims An Ownership Stake In OpticalTel After The Deal Is Announced.

In Schedule 4.02 to the Capitalization Representations, Sellers identified all persons who own Equity Securities in any of the Company Group entities.[86] After the parties signed the Merger Agreement, a Company employee who did not appear on Schedule 4.02, Rafael Marquez, claimed ownership in certain Company Group entities.

---

[81] *Id.* § 6.04(a).

[82] *Id.* § 6.18(a).

[83] *Id.* § 8.01(d).

[84] *Id.* § 8.01(a).

[85] Dkt. 147 at 13 ("In the event that the Closing Date does not occur on or before . . . the date that is five business days after the Outside Date . . . , if the Acquisition has not been consummated on or prior to such date, . . . the applicable commitments hereunder shall automatically terminate.").

[86] JX-616 at 19.

### 1. Marquez's 2004 Software Agreement

Marquez's relationship with Sellers dates back to 2004. When Bustamante formed the Company, the business needed software for various billing and provisioning tasks.[87] Bustamante testified that he designed that software himself, including the databases, tables, naming conventions, and flow charts.[88] Given the time demands of running the business, however, Bustamante needed coders to implement the software's design.[89] He hired Marquez at the recommendation of a friend.[90]

Bustamante could not afford to pay Marquez the $6,000 per month that Bustamante's prior employer had paid its coders.[91] Bustamante and Marquez discussed a compromise, which they memorialized in a Software Development Agreement dated April 19, 2004 (the "Software Agreement").[92] The key language is in Section 2 of the Software Agreement:

> ***Fee and Other Compensation.*** In consideration of the services to be performed during the term of this Agreement, HControl shall pay to the Consultant:
>
> - $3,000 per month payable on the 15th and 30th day of each month.

---

[87] Trial Tr. at 101:19–102:7 (Bustamante).

[88] *Id.* at 102:8–102:22 (Bustamante).

[89] *Id.*

[90] *Id.* at 102:23–103:11 (Bustamante).

[91] *Id.* at 103:18–104:13 (Bustamante).

[92] JX-3; *see also* Trial Tr. at 104:19–105:8 (Bustamante) ("And so I told him that what I was willing to do, if he accepted the $3,000, was if I ever sold the software and I got money from the sale of the software, I would give him 5 percent of whatever I got.").

- 5% ownership of HControl Corporation to be distributed upon a liquidation event.[93]

During trial, Bustamante provided context for this arrangement. He testified that Marquez did not want stock in HControl Corporation for tax reasons.[94] Bustamante further testified that he did not want to issue stock to Marquez because Bustamante wanted to own and control 100% of each of his companies.[95] While there were discussions about licensing the software to monetize it, the Software Agreement did not cover licensing fees.[96] On its face, the Software Agreement states that it is the parties' "entire agreement" and is non-assignable.[97]

Bustamante did not view the Software Agreement as conveying a form of equity interest.[98] And he did not treat Marquez as a stockholder. Marquez never received a K-1, never received any distributions, and never voted on any matters as a stockholder of HControl Corporation.[99] Bustamante assumed that the Software Agreement called for

---

[93] JX-3.

[94] Trial Tr. at 105:9–23 (Bustamante) ("He did not want stock in HControl because he had a tax issue with the IRS at the time. Also, if you gift him or give him the stock, he's going to have to pay taxes on it, which he obviously didn't want to do.").

[95] *See id.* (Bustamante) ("I also didn't want to have to have a partner. I wanted to have 100 percent ownership because I wanted to be able to execute my strategy without having to worry about what somebody else -- whether somebody else agrees or disagrees with what I am doing.").

[96] JX-5 at 1; Trial Tr. at 155:3–156:7 (Bustamante).

[97] JX-3 at 3.

[98] Trial Tr. at 107:18–108:1, 108:18–109:22 (Bustamante).

[99] *Id.* at 110:2–7 (Bustamante).

some form of cash payment that Bustamante would make to Marquez upon a liquidation event, like the merger.[100]

Marquez worked for Sellers until around 2016,[101] and communications between Marquez and Bustamante around the time of Marquez's departure provide further context for the Software Agreement. In one email, Bustamante described the Software Agreement as providing $6,000 per month: "[W]e would defer $3,000 for future payment and you would collect $3,000 in cash per month."[102] Bustamante expressed concern that Marquez was attempting to claim 5% ownership over the entire Company Group, although the Software Agreement limited his stake to HControl Corporation.[103] Marquez was being difficult at that time, vacillating between a strong "dislike"[104] and a "love you to death"[105] attitude toward Bustamante. After some cajoling, Bustamante got Marquez to confirm his understanding that the Software Agreement was limited to HControl Corporation and did not extend to other entities.[106]

---

[100] *Id.* at 109:7–21 (Bustamante).

[101] Marquez Dep. Tr. at 90:5–12; Trial Tr. at 111:5–111:20, 158:17–159:18 (Bustamante).

[102] JX-34 at 2; *see also id.* at 4 (explaining that Marquez would get 5% of proceeds from a sale of the software).

[103] *See, e.g.*, *id.* at 3 (Sept. 8, 2016 email from Bustamante to Marquez stating, "I hope you are not trying to claim ownership in those entities because if you are, we have a serious problem.").

[104] *Id.* at 1 (Marquez emailing sober).

[105] JX-35 (Marquez emailing drunk).

[106] *See, e.g.*, *id.* at 1 (Marquez replying to Bustamante's request that Marquez confirm his understanding that his 5% ownership is limited to HControl Corporation, "Also make sure that as I don't have any interest in any of your interest, you will stop anybody from firing

### 2. Marquez's Shakedown

A few weeks after the Merger Agreement was publicly announced, Marquez emailed Bustamante, ostensibly to congratulate him on the deal.[107] Marquez also "assured" Bustamante (unsolicited) that his intentions were "all good."[108] This was the first interaction between Bustamante and Marquez since 2016.[109] On December 29, 2022, Marquez sent a follow-up email to Bustamante, writing, "[f]or almost two decades it was a tacit agreement that you would take care of me when the company was sold. You can easily take care of me with 5% of 5% of . . . what you are getting."[110] On December 30, Marquez requested a meeting with Bustamante.[111] Bustamante replied that he needed time to collect documentation, but he attempted to comfort Marquez: "Don't stress out because I have no intention of walking away from my commitments and I'm not stalling, I simply have a ton of work to do to get ready for a closing."[112] After a few more emails, Bustamante agreed to meet with Marquez.[113] Bustamante did not disclose his interactions with Marquez to Buyers in the period between December 27 and December 30, as he did not

---

me or anything bad that could or would happen to me regarding Hcontrol."); JX-36 at 1 (Marquez replying to Mario, "I do not have any interests or claims to any other companies or entities other than to HControl Corporation, the owner of the software.").

[107] JX-175.

[108] *Id.*

[109] Bustamante Dep. Tr. at 81:12–17.

[110] JX-128.

[111] JX-608 at 4.

[112] *Id.* at 3.

[113] Trial Tr. at 139:4–16 (Bustamante).

think it was relevant.[114]  Bustamante testified that, at this time, he believed Marquez's 5% interest in HControl Corporation to be worth a maximum of $300,000[115] and that he did not view it as subject to the Capitalization Representations.

The interactions quickly escalated.  By January 3, 2023, Marquez had retained a Florida personal injury attorney, John Hoffman, whom he began copying on his emails to Bustamante.[116]  Marquez's emails became "aggressive" and "unpredictable."[117]  Marquez started claiming to be a "co-founder" of the Company Group.[118]  By January 5, 2023, Marquez was describing himself to Bustamante as a "totally out of control and really angry partner that feels completely betrayed and cheated by you."[119]  Marquez began demanding settlement amounts far beyond what Bustamante viewed as reasonable.[120]  Bustamante told Marquez to direct future communications to Sellers' counsel.[121]

---

[114] *Id.* at 140:16–141:8 (Bustamante) ("This is a post-closing -- this is a negotiation I have to have with Rafael Marquez to see what kind of payment he's going to get after the closing. And it's just one of many payables and many issues that we've got to deal with.").

[115] *Id.* at 145:16–23 (Bustamante).

[116] JX-177.

[117] Trial Tr. at 146:9–17 (Bustamante).

[118] JX-177.

[119] JX-178.

[120] Trial Tr. at 146:22–149:1 (Bustamante).

[121] JX-178 at 3 (Jan. 5, 2023 email from Marquez to Bustamante stating: "From this point on, do not communicate directly with me in any way.  You will be hearing from [my counsel] soon.").

Rebuffed but undeterred, Marquez switched tactics and told Bustamante that he intended to be as disruptive as possible by contacting Buyers, Buyers' attorneys, Buyers' bankers, and any financing parties he could identify.[122]

On January 6, Sellers informed Buyers of the Marquez issue through counsel.[123] Word of Marquez had not yet reached Buyers' senior partner Kevin Genieser, however. Much to his surprise, Genieser began receiving voicemails and calls on his personal phone from Marquez on the evening of January 6.[124] Genieser did not engage with Marquez, then or ever,[125] but Genieser did forward the messages to Lazard.[126]

At Genieser's request, Lazard scheduled a call for Saturday, January 7, to discuss Marquez.[127] During the call, Bustamante stated his understanding that Marquez would

---

[122] JX-178 at 1 (Marquez responding "I have nothing to discuss with your "private" attorneys. You can't and won't control who I talk to . . .."); *see also* Trial Tr. at 543:14–17 (Marquez) ("Question: Was it part of your strategy to loudly make your claims known to Antin and its representatives? Answer: H*ll yes.").

[123] JX-185.

[124] Trial Tr. at 892:14–894:22 (Genieser); JX-176 (Marquez texting Genieser: "I am the original developer and sole owner of all the software that the company uses up to this very day," claiming that he was "ready to share pertinent information" with Buyers, and offering that Marquez "will be very useful to you").

[125] Trial Tr. at 896:21–897:4 (Genieser); *see also, e.g.*, JX-195 (Jan. 9, 2023 email from Genieser stating "he [Marquez] called me again a few minutes ago. I did not pick up.").

[126] JX-176; JX-180; JX-181; Trial Tr. at 893:4–894:8 (Genieser).

[127] JX-189.

receive a payment out of the proceeds of the sale.[128]  After the call, Latham referred to Marquez as a "capitalization issue."[129]

As the Marquez issue developed, Bustamante drafted summaries of his relationship with Marquez to provide to counsel and Buyers.[130]  The summaries used a variety of verbiage to describe Marquez's rights.  In a January 8 memo, for example, Bustamante wrote that Marquez "would be treated as a 5% owner, meaning he would get 5% of the profit" from HControl Corporation.[131]  In a later memo, Bustamante wrote that Marquez had an "ownership interest" that entitled him to "5% of any net proceeds made from licensing fees on the software or from a liquidity event in respect of HControl Corporation."[132]

---

[128] Trial Tr. at 152:4–6 (Bustamante) ("It means that I know about Rafael Marquez.  I made a deal with him, and I have known that he was one of the issues I had to deal with post-closing."); *id.* at 895:22–896:2 (Genieser) ("I remember Mario being very apologetic, saying it's -- he was aware of this issue and -- but had never thought it would get to this point and so was surprised that Marquez had reached out to me and had taken this additional step.").

[129] JX-339 at 2; *see also* Trial Tr. at 130:12–17 (Bustamante) ("I was approached by Latham, and I was asked if I was willing to give a special indemnity to handle any cap issues.  And I said absolutely, no problem, I will agree to anything they want as far as capitalization issues because I understand their position."); *id.* at 642:10–16 (Turek); Hawa Dep. Tr. at 79:19–80:8.

[130] *See* JX-5 (memo provided to Sellers' Florida counsel); JX-265 (memo provided to Greenberg).

[131] JX-5 at 1.

[132] JX-265 at 3.

Marquez's campaign continued.[133] In a January 8 voicemail to Genieser, Marquez described himself as a "whistleblower," accused Bustamante of using shell companies to improperly shift assets around, and warned that there were other individuals who owned equity in Sellers but were not being paid as part of the transaction.[134] In another voicemail to Genieser, Marquez promised that he "would not go away."[135] Marquez conveyed the same determination to a Latham corporate partner.[136]

On January 9, Greenberg called Marquez to request that he stop contacting Buyers.[137] The call lasted about fifteen minutes, during which Marquez thanked Buyers for returning his call and tried to dive in to the details of his claims.[138] The call ended when Marquez told Greenberg that he was represented by Hoffman.[139]

Sellers hired Florida counsel to respond to Marquez.[140] O'Naghten forwarded some of this correspondence to Greenberg, which included a copy of the Software Agreement.[141] A Greenberg attorney then reached out to Hoffman directly to "get some time to speak to

---

[133] JX-195; JX-541; JX-542.

[134] JX-541; JX-233 at 7.

[135] JX-542.

[136] JX-218 (voicemail from Marquez stating he was "trying to contact all the parties" to let them know that he was "not going away").

[137] Trial Tr. at 686:5–15 (Turek).

[138] *Id.* at 686:16 – 687:9 (Turek).

[139] *Id.*

[140] *See, e.g.*, JX-183; JX-186; JX-187 (Jan. 6, 2023 letter to Hoffman); JX-190; JX-196 (Jan. 9, 2023 letter to Hoffman).

[141] JX-196.

Rafael" and to ask for "the materials [Marquez] believe[s] substantiate his position."[142]

Greenberg did not include any of Sellers' representatives on this outreach.[143] Although

Hoffman agreed to the meeting, Greenberg refused to sign a formal confidentiality

agreement and ultimately pulled the plug before any meeting occurred.[144] Hoffman,

however, continued contacting Greenberg.[145]

Meanwhile, Marquez's claims became more ambitious. On January 13, 2023,

Hoffman sent separate letters to Sellers' Florida counsel and to Greenberg. Each stated

that Marquez was asserting two claims for cash payments that extended well beyond the

Software Agreement.[146] The letter to Greenberg also stated that Marquez owned HControl

---

[142] JX-233 at 1.

[143] *See id.*

[144] *See id.* at 90; JX-251 at 3.

[145] *See* JX-260; JX-331; JX-357; JX-393; JX-410; JX-484; JX-497; JX-499. Hoffman contacted Greenberg each time he corresponded with Sellers. *See, e.g.*, JX-331; JX-357; JX-393; JX-410; JX-484; JX-499. Each letter begins with the phrase, "[c]onsistent with your request to be kept up to date," but Greenberg denies ever making such a request. *See* Trial Tr. at 734:4–9 (Reiser) ("I never authorized Greenberg to be asking for updates. And my understanding is that Mr. Bustamante testified that he never asked for updates. So I don't believe this is consistent with reality."); *see also* Pusateri Dep. Tr. at 101:2–5.

[146] JX-259 at 1 (letter to Greenberg stating, "Just for the record Rafael Marquez does not recognize the contract he has been presented with as being enforceable."); JX-256 at 1 (letter to Sellers' Florida counsel demanding payment for an alleged liquidation event in 2009 and information rights to know the exact amount Bustamante and his family would receive in the transaction).

Corporation's software and threatened to make it available to a network of developers in Venezuela.[147] Buyers did not share the January 13 letter with Sellers.[148]

Litigators began gearing up to address the Marquez issue. On January 22, Sellers had an introductory call with Latham's litigators.[149] After that call, Latham's lead litigator, Chris Clark, began working on a memo to evaluate the exposure from Marquez.[150] Chris Clark suggested that Sellers and Buyers enter into a common interest agreement so that he could share his analysis of the Marquez issue[151] and asked for a call with Greenberg.[152]

The original call was "helpful and constructive."[153] After Greenberg and Latham discussed a common interest agreement, the discussion turned to the Marquez issue.[154] The parties talked in generalities about the possibility of setting up an indemnity or an escrow,[155] but no specifics were discussed.[156] The call ended with Chris Clark "saying that

---

[147] JX-259 at 1.

[148] Trial Tr. at 799:6–11 (Reiser).

[149] JX-288.

[150] *See* JX-311 at 10–17.

[151] *Id.* at 3; C. Clark Dep. Tr. at 81:10–23.

[152] JX-300.

[153] JX-302; *see also* Trial Tr. at 62:4–13 (Purohit).

[154] Trial Tr. at 30:9–18 (Purohit)

[155] *Id.* at 62:14–18 (Purohit).

[156] Edlin Dep. Tr. at 26:4–17.

he was going to send the Latham memo and that we would digest the memo and take it from there."[157] The litigators agreed to continue conferring on next steps.[158]

As the lawyers negotiated a common interest agreement, Buyers remained keen on closing and, according to Bustamante, were "acting like they already own the company."[159] Buyers were operating "full steam ahead" on the assumption that Bustamante would resolve the Marquez issue.[160] Buyers were "setting up appointments for Luis and telling him it's okay to sign some contracts and to close on an acquisition of a couple of very attractive properties."[161] At that time, Bustamante believed these deals were "clearly the right thing to do."[162]

As Buyers moved toward closing, they believed that Sellers were working to settle with Marquez.[163] Under this impression, Geneiser prepared his comments for Buyers' Investment Committee meeting on January 30,[164] and he secured the Investment Committee's approval for the deal team to continue toward closing while learning more about the Marquez issue.[165]

---

[157] *Id.* at 29:18–23.

[158] Trial Tr. at 62:14–18 (Purohit).

[159] JX-304.

[160] Trial Tr. at 723:15–724:15 (Reiser); *see also id.* at 901:11–902:7 (Genieser).

[161] JX-304.

[162] *Id.*

[163] Trial Tr. at 901:11–902:7 (Genieser).

[164] *Id.* at 906:2–6 (Genieser).

[165] JX-372 at 5.

### 3. Marquez Refuses Reasonable Settlement Overtures.

Sellers were having a difficult time bringing the Marquez issue to ground. Sellers had offered to mediate with Marquez, but those efforts were stymied by Marquez's request to see copies of the deal documents, which Bustamante did not provide.[166] Bustamante said that he did not provide a copy of the documents because they were confidential, but Sellers never asked Buyers for permission to share the deal documents with Marquez.[167] It seems likely that Bustamante did not want to provide the deal documents to Marquez, presumably because he was concerned (reasonably) about how Marquez would use them.

Ultimately, Sellers did make settlement offers to Marquez. Bustamante's first instinct was unusual (although perhaps relatable)—he decided to sic his cousin on Marquez to make him "go away."[168] Hoffman described the cousin's outreach as follows: "I'm offering you $300,000 to go away, you better take this offer in the next 24 hours, otherwise, I'll close on the deal, leave the amount in escrow, and good luck suing me in court."[169] It is unclear whether this was what was actually conveyed. In all events, Marquez denied the

---

[166] JX-304; *see also* JX-322.

[167] Trial Tr. at 646:3–10 (Turek); *id.* at 726:6–19 (Reiser) ("We would have been happy to do so. Obviously, we would have made Mr. Marquez sign an NDA, but similar to the common interest agreement, we wanted to do what we could to assist the sellers in getting this thing resolved so we can close.").

[168] JX-352 at 3.

[169] *Id.*

offer. Bustamante reported to Lazard that Marquez was "not interested in working something out right now" and that Marquez "wants to 'blow up the deal.'"[170]

Sellers made a second offer to Marquez on January 31.[171] Bustamante's Florida counsel wrote to Marquez and explained that Bustamante could not provide the deal documents to Marquez.[172] In another "exploding" offer that expired the next day, Bustamante's counsel offered to pay Marquez $204,750 for Marquez's entitlement to "5% of the net proceeds from the sale of HControl Corporation," assuming a sale price of $6.5 million.[173] Sellers did not share this letter with Buyers.[174] Marquez refused the offer.[175]

Sellers made a third offer to Marquez on February 1, offering $300,000 based on a $9.5 million valuation of HControl Corporation.[176] Sellers also proposed that if Marquez believed the valuation was too low, the parties could share the expense of a third-party appraiser.[177] The appraiser's determination could only increase the amount of Marquez's settlement; a lower valuation would not decrease the payout below $300,000.[178]

---

[170] JX-304 at 1.

[171] JX-322.

[172] Id.

[173] Id. at 1.

[174] Trial Tr. at 726:6–19 (Reiser).

[175] Id. at 223:13–15 (Bustamante).

[176] JX-324 at 3.

[177] Id.

[178] Id. at 3–4.

On February 2, Hoffman wrote to Sellers' counsel.[179] He threatened that "[b]efore any serious negotiations can start to resolve the matter at hand, you better reign in your client Mario Bustamante."[180] Hoffman stated that Bustamante's "reckless and unethical behavior," including trying to "go around" Hoffman via Bustamante's cousin, "continues to undermine the credibility and effectiveness of your efforts."[181]

Hoffman made an eye-popping offer of $4.5 to $5.4 million to resolve Marquez's claim.[182] That offer was based on Marquez's position that he was entitled to 5% of Bustamante's total deal proceeds because Bustamante had supposedly been playing "equity-diluting shell company games" to dilute Marquez's interest.[183] Bustamante thought this offer was "crazy" and ceased negotiations with Marquez.[184]

### 4. Sellers And Buyers Reach An Impasse.

Meanwhile, communications between Sellers and Buyers began to deteriorate. Genieser viewed Sellers' settlement efforts as inadequate and scheduled a one-on-one with

---

[179] JX-352.

[180] *Id.* at 3.

[181] *Id.*

[182] *Id.* at 4.

[183] *Id.*; *see also* Trial Tr. at 539:3–7 (Marquez) ("The reason I'm actually asking for Mr. Bustamante's [money] and not everybody else is because I do not know how many shell company games he has played and how many times he actually tried to dilute me and take me out of the contracts.").

[184] Bustamante Dep. Tr. at 207:4–7; *see also* Trial Tr. at 225:4–6 (Bustamente) ("I am not amenable to settling a blackmail. I'm not amenable to paying blackmail based on a claim that I committed fraud.").

31

Buyers' lead banker, Lazard's Garrett Baker, for January 30.[185]  According to Genieser, Baker became "threatening" during this meeting and stated that Sellers intended to force a closing regardless of Buyers' concerns.[186]  The tone was similarly hostile on a January 31 call between Latham and Greenberg.[187]  The attorneys convened to discuss Chris Clark's memorandum regarding Marquez.[188]  Greenberg attorneys testified that, during the meeting, Chris Clark became "hostile" and "shouted," threatening to sue Buyers if they did not resolve their concerns over Marquez.[189]

At Genieser's request,[190] Bustamante and he met in Fort Lauderdale on February 1.[191]  Genieser testified that, despite the ongoing issues, Bustamante and he had "always had a very good relationship and a very jovial type of relationship."[192]  According

---

[185] Trial Tr. at 907:13–23 (Genieser).

[186] *Id.* at 907:24–908:16 (Genieser); *see also id.* at 594:2–18 (Baker) (recalling himself stating that "Mario's trying to do the right thing here, but if you continue to hold this up, I believe he's going to sue you for specific performance, and I believe he'll win").

[187] JX-543; JX-321.

[188] Trial Tr. at 64:13–16 (Purohit).

[189] *Id.* at 645:8–20 (Turek); *see also* Hawa Dep. Tr. at 118:4–7.  When asked whether Chris Clark became agitated during the January 31 call, a former colleague of Chris Clark's at Latham testified: "You're talking about Chris Clark here.  Those words are relatively synonymous on any call that he's on."  Trial Tr. at 65:5–19 (Purohit).  Bustamante's contemporaneous email corroborates the attorneys' recount: "[On] Tuesday [January 31], there was a pretty heated discussion[] between all the lawyers in which our lawyers from Latham Watkins stated that if we gave them a 3 day notice they had an obligation to close and that their advice to us is that if they don't close, we should immediately file suit in Delaware."  JX-353.

[190] Trial Tr. at 908:17–909:2 (Genieser).

[191] *See* JX-353; Trial Tr. at 911:12–15 (Genieser).

[192] Trial Tr. at 912:19–913:3 (Genieser).

to Bustamante's contemporaneous account of the meeting, Genieser reiterated "how excited they are to buy the company, how they love the management team and how much they are looking forward to executing their very ambitious plans over the next few years."[193]  Genieser then "assured [Bustamante] that people who were saying they were getting cold feet or had buyer's remorse were wrong."[194]  By the time of trial, Genieser testified that "still like[d] the business" as an investment.[195]

The parties, however, were unable to reach an agreement on how to address the Marquez risks.  On February 1, Latham emailed Greenberg to propose restructuring the transaction to exclude HControl Corporation.[196]  To "ensure the Company Group has access to the license/software held by HControl Corporation to ensure continuity of the business," Sellers proposed that "Buyer/Company Group would enter into a licensing agreement with HControl Corporation for $1.00 / year."[197]  The proposal also suggested that "Bustamante would covenant in good faith to resolve the Marquez issue."[198]  Bustamante also offered to indemnify Buyers for any costs relating to the Marquez issue, although the Merger Agreement already included the Special Indemnity.[199]

---

[193] JX-353 at 1.

[194] *Id.*

[195] Trial Tr. at 891:7–22 (Genieser) ("I still think it has a lot of growth potential.  I think it is a very exciting, dynamic market.").

[196] JX-339 at 1–2.

[197] *Id.* at 2.

[198] *Id.*

[199] *Id.*

Latham's February 1 proposal did not include an escrow of any funds to cover liability relating to Marquez. The lack of escrow confused Buyers' in-house counsel, Marc Reiser, and Greenberg because Latham had indicated that an escrow would be part of any proposal.[200] Buyers rejected the proposal.[201]

### 5. Buyers Serve Their First Notice Of Breach.

Buyers were first informed of the Marquez issue on January 6, 2023. They did not immediately serve a notice of breach because they anticipated that Sellers would fix the problem.[202] By February 6, however, Sellers had not done so.

On February 6, 2023, Buyers' Investment Committee met to receive "an update on the status of closing."[203] The deal team explained that "it does not appear that Sellers have

---

[200] Trial Tr. at 728:20–729:7 (Reiser) ("And then we received this email from Latham, which, number one, didn't include an escrow, which was what has been told. . . . This was unfortunate to receive, from my perspective."); Hawa Dep. Tr. at 121:16–20 ("I don't remember which one it was, but there -- there was like one of Latham's – 'Here's a proposed resolution.' It didn't have an escrow in it. Although we were fully expecting it, in view of our conversations.").

[201] Trial Tr. at 729:11–730:5 (Reiser) (testifying that Latham's proposal was "not something that [Buyers] can accept on a go-forward basis" because Buyers required either a settlement with a full release from Bustamante or a unilateral right to settle with Marquez out of an escrow fund).

[202] *Id.* at 646:21–647:2 (Turek) ("Q. Under the terms of the merger agreement, could Antin have served a notice of breach earlier than February 6? A. Yes, they could have. They could have served it, in my opinion, January 9, when we got a copy of the software development agreement."); *id.* at 732:2–14 (Reiser) (similar); *id.* at 918:20–919:3 (Genieser) ("We wanted to give them time to resolve it. We thought, frankly, that they might need some time to resolve it. They had a good period of time. Again, what surprised me in those conversations early February, they didn't seem to be focused on resolving the issue.").

[203] JX-372.

34

taken actions to cure the breach to-date notwithstanding the fact that Antin has provided Sellers with over a month to resolve the issue."[204] Genieser testified that the Investment Committee "decided to serve the notice of breach because we wanted to send another indication that we were quite serious about it."[205] The Investment Committee unanimously "determined that it was appropriate for the deal team to serve the notice of breach on the Sellers."[206] Reiser also authorized the notice of breach,[207] and Buyers served the notice that afternoon.[208] The notice of breach letter was based on a breach of the Capitalization Representations.[209]

Even at this point, Genieser testified that he "never thought that we would actually terminate the transaction," because he thought that Bustamante and the rest of Sellers would resolve the outstanding issues.[210]

The parties dispute Buyers' motives for serving the notice of breach on February 6. In this litigation, Sellers came to believe that the notice had something to do with an investigative report on the Company Group, Bustamante, and Rodriguez prepared by a third party, Kroll.[211] Buyers received the report on February 1, after they had

---

[204] *Id.*

[205] Trial Tr. at 917:1–7 (Genieser).

[206] JX-372; Trial Tr. at 900:8–15 (Genieser).

[207] Trial Tr. at 792:14–16 (Reiser).

[208] JX-344.

[209] *Id.*; *see also* Trial Tr. at 683:1–4 (Turek).

[210] Trial Tr. at 917:8–20 (Genieser).

[211] JX-323.

commissioned it mid-January upon learning about Marquez.[212] The report cast a number of aspersions on Sellers, who received a copy through discovery. Sellers deny the statements in the report. Sellers point to this report as the impetus behind Buyers' decision to back out of the deal. They insinuate that Buyers' legal grounds for termination are pretextual.

At trial, Buyers' representatives testified, again credibly, that the Marquez issue concerned them. They acknowledged that the post-closing risks related to Marquez were not primarily financial—Buyers viewed Marquez's claim as "worth a minimal amount of money compared to the deal."[213] Buyers believed, however, that Marquez would continue to pursue his claims aggressively post-closing[214] and that litigation would consume and distract Sellers' management.[215] Buyers also had reputational concerns related specifically to the Marquez issue. They were worried about being "dragged through the mud" with the local communities,[216] their creditors,[217] and their limited partners.[218] Genieser relayed

---

[212] JX-253; JX-262.

[213] JX-286 at 1.

[214] Trial Tr. at 916:15–24 (Genieser).

[215] *Id.* at 597:2–11 (Baker); *id.* at 806:15–20 (Reiser); *id.* at 938:20–939:1, 903:10–15 (Genieser).

[216] JX-286; Trial Tr. at 916:15–24 (Genieser) (expressing concerns that Marquez would go to the local press); *see also* Genieser Dep. Tr. at 225:5–13; Trial Tr. at 590:9–16 (Baker).

[217] Trial Tr. at 732:15–23, 806:2–6 (Reiser); *see also* Crosbie Dep. Tr. at 79:2–12.

[218] Trial Tr. at 730:6–20 (Reiser) ("We can't have this where we close and especially know about an individual who has an ownership interest in the company that we're buying and then are tied up in litigation with that individual. We can't explain that to our limited partners."); *id.* at 916:5–14 (Genieser) (describing Antin's limited partners base as

36

these risks to Lazard and Bustamante in real time.[219]

It is also true that Buyers' trust in Bustamante had frayed, and perhaps the Kroll report played a role in this.[220]  Bustamante's failure to disclose Marquez (and Iqbal, discussed below), surely also played a role in Buyers' diminishing trust.[221]

In all events, the parties' dispute over Buyers' motives are largely beside the point. The real issue, discussed in the legal analysis, is whether they had a legal basis to notice a breach and terminate the Merger Agreement.

### E. Sellers Attempt To Cure The Marquez Issues Through A Transfer-Dissolution Plan.

Sellers' first response to the February 6 notice of breach was to attempt, again, to negotiate a settlement with Marquez.[222]  That did not work.  So, Bustamante asked Latham to come up with a way to cure the breach.[223]  Latham devised the transfer-dissolution plan.

---

"conservative" and that it would be "hard to justify" post-closing that Buyers had chosen to go through with the transaction despite knowing about a capitalization risk).

[219] *Id.* at 168:7–19 (Bustamante); *id.* at 590:5–18 (Baker); *id.* at 907:13–23, 911:21–912:5 (Genieser)

[220] *Id.* at 791:24–792:2 (Reiser).

[221] *Id.* at 589:17–20 (Baker); *id.* at 791:13–23 (Reiser); *id.* at 910:19–911:3.

[222] They made a generous offer to pay Marquez $300,000.00 "to 'assist with the closing," and without prejudice to Marquez's ability to pursue claims against Bustamante concerning "any additional amounts that Mr. Marquez believes he is due from his 5% interest in HControl Corporation."  JX-358 at 1.  Marquez should have accepted that offer.  He rejected it.  Trial Tr. at 226:16–18 (Bustamante).

[223] Trial Tr. at 263:13–17 (Bustamante).

### 1. Sellers Propose The Transfer-Dissolution Plan, Which Buyers Object To As A Breach Of Interim Covenants.

With an aim to reduce any claim to equity by Marquez to a damages claim, Sellers laid out the plan to transfer HControl Corporation's assets and then dissolve HControl Corporation in a February 17 letter to Buyers.[224] Simplified, the transfer-dissolution plan would involve three sequential steps.[225] First, HControl Corporation would transfer its proprietary software to HControl Holdings in exchange for $215,000 (5% of the software's valuation of $4.3 million) paid into a trust.[226] Second, Sellers would dissolve HControl Corporation by filing articles of dissolution in Florida.[227] Third, when HControl Corporation eventually settled or litigated its claims with Marquez through the dissolution proceedings, the trust would pay up to $215,000 and Bustamante would indemnify HControl Corporation for any excess.[228]

Buyers were not enthused with the plan. In response to Sellers' February 17 letter, Buyers took the position that the plan would breach interim covenants.[229] Buyers also lamented that the dissolution process could take months, and then the statute of limitations period for bringing claims against HControl Corporation would extend for another four

---

[224] JX-376.

[225] Trial Tr. at 264:1–13 (Bustamante).

[226] *Id.*

[227] JX-376 at 2.

[228] *Id.*

[229] JX-378.

years under Florida law.[230]  Sellers responded by seeking Buyers' consent to the plan.[231] Buyers did not consent.

### 2.  Sellers Go Forward With The Transfer-Dissolution Plan.

Sellers went forward with the plan.  On February 23, Bustamante executed an agreement transferring HControl Corporation's software to HControl Holdings.[232]  The agreement assumed a fair market value of the software at around $4.3 million.[233]  Sellers arrived at this figure based on an informal analysis conducted by Mark Clark that hewed to the cost of replacing the software.[234]  The $215,000 was paid into a trust to address Marquez's claims.[235]  Bustamante also agreed to indemnify HControl Corporation and other Company entities for any amount above $215,000 in connection with Marquez's claims (the "Indemnity Agreement").[236]  Sellers filed articles of dissolution for HControl Corporation with the Florida Department of State on February 23.[237]  Sellers submitted their Pre-Closing Statement to Buyers on February 27.[238]

---

[230] *Id.* at 2.

[231] *Id.* at 3.

[232] JX-386.

[233] *Id.* at 2.

[234] Trial Tr. at 478:4–20 (M. Clark).

[235] JX-386 at 1.

[236] *Id.* at 2.

[237] JX-397 at 2.

[238] JX-404.

### 3. Buyers Send A Notice Of Breach Based On The Transfer-Dissolution Plan.

Buyers sent their second notice of breach letter on March 1.[239] In the March 1 notice of breach, Buyers stated that the dissolution failed to resolve Sellers' breach related to Marquez and had incurred further breaches of the Merger Agreement.[240] Buyers noted that the asset transfer failed to account for third-party contracts held by HControl Corporation, which could not be assigned without those third parties' consents and therefore could form an ongoing basis for Marquez's claim against HControl Corporation.[241] Buyers also raised concerns that the dissolution could give rise to a claim of fraudulent transfer.[242]

### F. Buyers Terminate The Merger Agreement Based On The Marquez Issues.

On March 6, Buyers' deal team advised the Investment Committee that Sellers had not yet cured the breach of the Capitalization Representations related to Marquez.[243] The Investment Committee determined that if Sellers did not cure the Marquez breach by March 7, Buyers would terminate the Merger Agreement on March 8.[244]

On March 8, Buyers terminated the Merger Agreement due to Sellers' failure to cure their breach of Section 4.02 related to Marquez.[245] At trial, Genieser testified that, at

---

[239] JX-411.

[240] *Id.* at 1.

[241] *Id.*

[242] *Id.*

[243] JX-491 at 3.

[244] *Id.*

[245] JX-492.

40

this point, he still viewed the deal as economically attractive and found Bustamante

enjoyable.[246] He simply was not willing to accept the risks associated with Marquez.[247]

### G. A Second Former Employee, Wajid Iqbal, Claims An Ownership Interest In Sellers.

The Marquez dust-up unearthed another potential capitalization issue. In one of

Marquez's voicemails to Genieser, Marquez stated, ominously: "I am not the only one."[248]

Somewhat alarmed, Buyers asked Sellers for more information concerning potential equity

holders.[249] Through an exchange of communications concerning the requests, Sellers

identified Iqbal as a potential option holder. Iqbal's potential claims had not been disclosed

during due diligence.[250]

#### 1. Iqbal Claims Options, Warrants, And Ownership Interests.

Iqbal was OpticalTel's Chief Technology Officer from 2007 until 2014.[251] During

his employment, the HControl Holdings Board executed written consents providing that

Iqbal "shall" receive options in three consecutive years. In 2012, Iqbal executed a

---

[246] Trial Tr. at 936:2–9 (Genieser) ("Q. To this day you still like OpticalTel's business very much? A. I do. Q. And you still like Mr. Bustamante? A. I still like Mr. Bustamante. Q. And the management team still remains very strong? A. Yes.").

[247] *Id.* at 919:16–22 (Genieser) (describing the Investment Committee's determination that "because the issue was not resolved, we do not feel we could close over this issue and that we should issue the notice to terminate").

[248] JX-542; Trial Tr. at 904:14–16 (Genieser) (recalling Marquez saying there "were others out there").

[249] JX-289; JX-351.

[250] Trial Tr. at 313:14–16 (Rodriguez); *id.* at 338:14–18 (O'Naghten); *id.* at 775:8–13 (Reiser).

[251] *Id.* at 178:5–8 (Bustamante)

promissory note in which he loaned $33,300 to HControl Holdings.[252] In exchange, Iqbal received warrants to purchase 2,664 shares of HControl Holdings at a strike price of $2.50 per share.[253] Also, according to Iqbal, when he began employment negotiations with Bustamante in 2006, Bustamante orally offered to pay Iqbal $7,000 per month plus a five percent ownership interest in OTI Fiber, which Iqbal accepted.[254]

### 2. Sellers Attempt To Settle With Iqbal.

Buyer's investigation prompted Sellers to contact Iqbal to schedule a meeting, which occurred on February 10, 2023.[255] Iqbal testified that, during the meeting, a prominent HControl Holdings investor made Iqbal an offer to settle his claims for $55,000.[256] The investor then presented Iqbal with a release that O'Naghten had prepared.[257] Iqbal rejected the offer, refused to sign the release, retained counsel, and sent a demand on February 22.[258] The factual bases for Iqbal's claims are discussed in greater detail the legal analysis.

---

[252] JX-21 at 2.

[253] *Id.* at 5.

[254] Trial Tr. at 565:4–16 (Iqbal).

[255] *Id.* at 563:7–18 (Iqbal).

[256] *Id.* at 563:7–18 (Iqbal)

[257] *Id.* at 563:7–18 (Iqbal); *id.* at 373:9–11 (O'Naghten); *see also* JX-325 (draft of Iqbal release).

[258] JX-385; Trial Tr. at 564:4–7 (Iqbal) (testifying that the OpticalTel representative wrote the number on a napkin and that he was insulted by the amount offered).

### 3. Buyers Notice A Breach Based On The Iqbal Issues.

Sellers provided a copy of Iqbal's February 22 letter to Buyers' counsel around February 24,[259] and Buyers requested additional information regarding Iqbal's claims in their March 1 notice of breach.[260] After Sellers filed this action, Buyers sent a third notice of breach due to Iqbal on March 7, which started Sellers' 20-day cure period.[261]

### H. Buyers Terminate The Merger Agreement Based On The Iqbal Issues And Also For Ostensible Breach Of The No-Shop.

On April 11, Buyers again terminated the Merger Agreement under Section 8.01(d) due to Sellers' failure to cure their breaches of the Merger Agreement arising out of the transfer-dissolution plan and Sellers' failure to cure the Iqbal issues.[262]

The April 11 notice added a no-shop breach to Buyers' termination arsenal. On March 5, Sellers' litigation counsel had sent a formal "notice of intent to commence litigation"[263] and proposed a one-week standstill agreement during which Sellers would be allowed to "contact other potential buyers to assess interest in buying OpticalTel as an alternative to the Antin transaction."[264] Seemingly based on the March 5 request to contact other potential buyers, the April 11 letter stated opaquely that "Buyer has reason to believe that Sellers have committed another breach by" engaging in discussions or negotiations

---

[259] JX-398.

[260] JX-411 at 4.

[261] JX-487.

[262] JX-511.

[263] JX-485.

[264] *Id.* at 1–2.

with other potential purchasers in violation of Section 6.18.[265] Buyers developed these suspicions further during discovery and at trial based on communications among Sellers referring to a "backup" plan; those allegations are discussed more fully in the legal analysis. For the purposes of the April 11 letter, Buyers claimed that the no-shop breach gave rise to irreparable harm under Section 6.18(c), meaning that it was an incurable breach.[266] Buyers independently terminated the Merger Agreement on this basis on April 11.[267]

## I.     This Litigation

Sellers filed their complaint on March 6 in anticipation of Buyers' March 8 termination notice.[268] The parties agreed to an expedited schedule leading to a three-day trial, which took place from May 10 through May 12, 2023.[269] Posttrial briefing concluded on May 22, 2023.[270] There was no time for posttrial argument.

## II.     LEGAL ANALYSIS

Buyers claim that Sellers breached the Merger Agreement, and failed to cure those breaches, in three ways. First, they claim that Sellers breached the Capitalization Representations because Marquez and Iqbal own interests captured by the Capitalization

---

[265] JX-511.

[266] *Id.*

[267] *Id.* at 2.

[268] Dkt. 1.

[269] Dkts. 134–36.

[270] Dkt. 137 ("Sellers' Opening Posttrial Br."); Dkt. 138 ("Buyers' Opening Posttrial Br."); Dkt. 141 ("Sellers' Answering Posttrial Br."); Dkt. 144 ("Buyers' Answering Posttrial Br.").

Representations and because Sellers failed to cure the issues. Second, they claim that Sellers breached their interim operating covenants by consummating the transfer-dissolution plan and entering the Indemnity Agreement, both without Buyers' consent, which was not unreasonably withheld. Third, they claim that Sellers breached the no-shop provision by engaging with a third party regarding an alternative transaction.

Sellers claim that Buyers breached the Merger Agreement in multiple ways, but only two require separate analysis. First, Sellers claim that Buyers breached by contacting Marquez without Bustamante's written consent. Second, they claim that Buyers breached by failing to use their best efforts to consummate the merger.

Typically, the party seeking to enforce a contract must prove each element of its breach of contract claim by a preponderance of the evidence.[271] M&A agreements add a layer of complication to the burden-shifting analysis.[272] Skipping the extended discussion of these complications in the interest of expediency, the burden-shifting analysis shakes out in this case as follows. Buyers bear the burden of proving by a preponderance of the evidence their claims for breach.[273] Sellers bear the burden of proving by a preponderance

---

[271] *See Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *19 n.214 (Del. Ch. Aug. 10, 2020).

[272] *See generally S'holder Representative Servs. LLC v. Shire US Hldgs., Inc.*, 2020 WL 6018738 (Del. Ch. Oct. 12, 2020), *aff'd* 267 A.3d 370 (Del. 2021) (TABLE) (footnotes omitted); *AB Stable III LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *50 (Del. Ch. Nov. 30, 2020), *aff'd,* 268 A.3d 198 (Del. 2021).

[273] *AB Stable*, 2020 WL 7024929, at *50 ("This court also has held that when a buyer claims that a covenant compliance condition failed because the seller failed to operate its business in the ordinary course, then the buyer has asserted a theory analogous to a claim

45

of the evidence that Buyers could not exercise their termination rights because Buyers were in breach of their own obligations.[274]

The Merger Agreement is governed by Delaware law, so Delaware's principles of contract interpretation apply.[275] Under Delaware law, when interpreting a contract, 'the role of a court is to effectuate the parties' intent."[276] The court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions,"[277] unless the contract is ambiguous.[278] The court must not read ambiguity into a contract where none exists.[279] "[A] contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[280] "[A]mbiguity does not exist where the court can determine the meaning of a contract

---

for breach of the underlying covenant and bears the burden of proof.") (citing *Akorn Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *82–83 (Del. Ch. Oct. 1, 2018)).

[274] *Akorn*, 2018 WL 4719347, at *4. In addition, if this analysis reached the issue of specific performance (it does not), Sellers would bear "the burden of proving by clear and convincing evidence the facts necessary to justify a decree of specific performance." *Id.*

[275] Merger Agreement § 10.05.

[276] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[277] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

[278] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[279] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) ("[C]reating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.").

[280] *Id.*; *see also Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992).

'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[281]

Applying these principles, this decision proceeds in four parts. Part A addresses Buyers' claims for breach of the Capitalization Representations. Part B addresses Buyers' claims for breach of the interim covenants. Part C addresses Buyers' claims for breach of the no-shop provision. Part D addresses Sellers' claims for breach relating to contact with Marquez and Buyers' best efforts to consummate the merger.

## A.  Buyers' Claims For Breach Of The Capitalization Representations

If the Capitalization Representations of Section 4.02 were not "true and correct in *all* respects,"[282] and Sellers failed to cure the breaches, then Buyers validly terminated the Merger Agreement under Section 8.01(d).  Buyers claim the Capitalization Representations are not true and correct in all respects and Sellers failed to cure the breaches, such that they were permitted to terminate the Merger Agreement.  Sellers deny that the Capitalization Representations were inaccurate, and argue that, even if inaccurate, they were cured.

In its full glory, Section 4.02 containing the Capitalization Representations provides:

> Section 4.02 Company Group.  Schedule 4.02 sets forth, as of the date hereof, the name of each member of the Company Group, and, with respect to each such member of the Company Group, (a) the jurisdiction in which it is incorporated or organized, (b) its form of

---

[281] *Id.* (quoting *Rhone–Poulenc Basic Chems.,* 616 A.2d 1192, 1196 (Del. 1992)).

[282] Merger Agreement § 7.01(a) (emphasis added).

organization and (c) the issued and outstanding Equity Securities thereof owned, directly or indirectly, by any Seller or any member of the Company Group. As of the date hereof, no member of the Company Group owns any capital stock or other Equity Securities in any Person that is not a member of the Company Group. The Units are duly authorized by the applicable Purchased Entities' Organizational Documents and are validly issued Equity Securities in the applicable Purchased Entity. The Units constitute the only outstanding Equity Securities of the Purchased Entities. All of the Equity Securities of each of the Subsidiaries of the Purchased Entities are wholly-owned by the applicable Purchased Entity or one of the applicable Purchased Entity's Subsidiaries. All of the issued and outstanding Equity Securities of each Subsidiary of the Purchased Entities have been duly authorized and validly issued, were not issued in violation of any preemptive rights, rights of first refusal or similar rights and are free and clear of all Liens (other than Permitted Liens). Each member of the Company Group is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, except where the failure to be so organized, existing and in good standing would not reasonably be expected to be, individually or in the aggregate, material to the Company Group, taken as a whole. Each member of the Company Group has all requisite limited liability company or other comparable entity power and authority enter into any Transaction Document (if applicable), consummate the Transactions (if applicable), and to own or lease all of its properties and assets and carry on its Business as it is now being conducted, except for such matters that would not reasonably be expected to be, individually or in the aggregate, material to the Company Group, taken as a whole. Each member of the Company Group is duly licensed or qualified to do business and is in good standing under the Laws of each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification required by Law, except where the failure to be so licensed, qualified or in good standing would not reasonably be, individually or in the aggregate, material to the Company Group, taken as a whole. There are no outstanding subscriptions, options, warrants, calls, stock appreciation rights, preemptive rights, phantom equity, convertible or exchangeable securities of any member of the Company Group, or other similar rights, agreements, arrangements, undertakings or commitments of any kind to which any such member of the Company Group is a party obligating it to: (i) issue, transfer, dispose of or sell

any Equity Securities of any member of the Company Group or securities convertible into or exchangeable or exercisable for such Equity Securities, (ii) grant, extend or enter into any such subscription, option, warrant, call, stock appreciation right, preemptive right, phantom stock, convertible or exchangeable securities or other similar right, agreement, arrangement, undertaking or commitment or (iii) redeem, repurchase or otherwise acquire any such Equity Securities. No Person will be entitled to exercise dissenters' rights or rights of appraisal in connection with the Mergers or the Transactions under any applicable Laws.[283]

The parties' dispute implicates two sets of Capitalization Representations. The first set at issue incorporates the definition of Equity Securities, in that Sellers represented that Schedule 4.02 lists "the only outstanding Equity Securities of the Purchased Entities" and that "all of the Equity Securities of each of the Subsidiaries of the Purchased Entities are wholly-owned by the applicable Purchased Entity or one of the applicable Purchased Entity's Subsidiaries."[284]

The Merger Agreement defines Equity Securities as any

(a) capital stock, member interests, or equity security, certificate of interest, rights to profits or revenue and any other similar interest in a Person or participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, partnership interest, limited partnership interest, Limited Liability company interest, interest in a joint venture, or certificate of interest in a business trust;

(b) security, warrant, right, put, call, straddle, option or other interest convertible into or exchangeable or exercisable for any of the foregoing, whether at the time of issuance or upon the passage of time

---

[283] *Id.* § 4.02. People who wonder why Court of Chancery decisions can be longer than decisions published by other courts often do not realize that the contractual provisions we are called upon to interpret extend for multiple pages.

[284] *Id.* (numbering added and formatting altered).

or the occurrence of some future event, including any security convertible, with or without consideration, into such a security or any other security carrying any warrant or right to subscribe to or purchase such a security; or

(c) warrant or right; or any put, call, straddle, or other option or privilege of buying such a security from or selling from or selling such a security to another without being bound to do so, and in any event "Equity Securities" includes any security having the attendant right to vote for directors or similar representatives.[285]

The second set of Capitalization Representations at issue covers interests other than Equity Securities, including phantom equity. Sellers represented that: "There are no outstanding . . . phantom equity, . . . or other similar rights, agreements, arrangements, undertakings or commitments of any kind to which any such member of the Company Group is a party obligating it to . . . grant, extend or enter into any such . . . phantom stock, convertible or exchangeable securities or other similar right, agreement, arrangement,

---

[285] *Id.* § 1.01 (formatting altered).

undertaking or commitment."[286]  The Merger Agreement does not define "phantom equity" or "phantom stock" or the other terms in this second set of Capitalization Representations.

Buyers contend that Sellers' Capitalization Representations are untrue because: (1) Marquez owns Equities Securities or phantom equity and the transfer-dissolution plan did not cure this issue; and (2) Iqbal owns Equity Securities.

### 1.    Marquez

Buyers' claim of breach relating to Marquez is limited to Marquez's rights under the Software Agreement,[287] which grants Marquez a right to "5% ownership of HControl Corporation to be distributed upon a liquidation event."[288]  The court must determine whether Marquez's "5% ownership of HControl Corporation to be distributed upon a liquidation event" falls within the definition of Equity Securities or phantom equity and, if so, whether Sellers successfully cured the breach through the transfer-dissolution plan.[289]

Sellers offer the transfer-dissolution plan as an easy off-ramp to the analysis, arguing that it cured whatever breach the Marquez issue created by reducing Marquez's

---

[286] *Id.* § 4.02 (numbering added and formatting altered).

[287] *See* Defs.' Opening Posttrial Br. at 44; Defs.' Answering Posttrial Br. at 6; Trial Tr. at 796:22–797:3 (Reiser).  Marquez asserts a series of ambitious legal theories, claiming that the Software Agreement is unenforceable to the extent that it only applies to HControl Corporation and not OpticalTel as a whole.  *See* Trial Tr. at 542:12–549:22 (Marquez).  Because Buyers do not rely on Marquez's far-fetched legal theories as a basis for their claim of breach, this decision does not address them.

[288] JX-3.

[289] Merger Agreement §§ 1.01, 4.02.

interest to a claim for money damages against HControl Corporation.[290] Sellers are imprecise on the mechanics. They imply, but do not state outright, that HControl Corporation's articles of dissolution filed on February 23, 2023, transmuted Marquez's interest—whatever it was—into a mere residual cash claim effective as of that date. There is probably a better short reference, but this decision refers to this argument as Sellers' "interest-transmutation theory." Sellers cite no cases to support their interest-transmutation theory, nor is this court aware of any; the issues required independent research into an area of law previously unexplored by this jurist—Florida dissolution law.

Under Florida law, "a corporation is dissolved upon the effective date of its articles of dissolution[.]"[291] In turn, "the term 'dissolved corporation' means a corporation whose articles of dissolution have become effective and includes a successor entity[,]" which "includes a trust, receivership, or other legal entity" that receives the dissolved corporation's assets and administers the winding down of the corporation's affairs.[292] After a corporation has been dissolved, it "may not carry on any business except that appropriate to wind up and liquidate its business and affairs," which includes "[c]ollecting its assets;" "[d]ischarging or making provision for discharging its liabilities;" "[m]aking

---

[290] Sellers' Opening Posttrial Br. at 42–43.

[291] Fla. Stat. § 607.1403(2).

[292] *Id.* § 607.1403(c)(3).

distributions of its remaining assets among its shareholders according to their interests;" and "[d]oing every other act necessary to wind up and liquidate its business and affairs."[293]

In broad strokes, dissolution does not seem to fundamentally alter the structure or form of a Florida corporation. Dissolution does not expose the corporation's directors or officers to "standards of conduct different from those prescribed" elsewhere in Florida law, "[c]hange quorum or voting requirements[,]" or "[t]erminate the authority of the registered agent of the corporation."[294] A dissolved corporation can sue and be sued,[295] and it retains title to its property even after filing articles of dissolution.[296] Furthermore, after filing, corporations may revoke their dissolution within 120 days.[297] If they do so, the revocation "relates back to and takes effect as of the effective date of the dissolution and the corporation resumes carrying on its business as if dissolution had never occurred."[298] In other words, the Florida legislature did not intend a dissolution filing to be a full-stop commitment to the winding down process; the filing simply initiates the process.

At a high level, articles of dissolution simply constrain the acts that a Florida corporation can undertake to ensure that it winds up its affairs instead of continuing to operate day-to-day. In keeping with this modest goal, Florida law indicates (in passing)

---

[293] *Id.* §§ 607.1405(1), (1)(a), (c)–(e).

[294] *Id.* §§ 607.1405(2)(c)–(d), (g).

[295] *Id.* § 607.1405(2)(e).

[296] *See Wilson v. Wilson*, 211 So.3d 313, 318 (Fla. Dist. Ct. App. 2017) ("dissolving a corporation does not transfer title, that is, ownership, of a corporation's assets.").

[297] Fla. Stat. § 607.1404(1).

[298] *Id.* § 607.1404(5).

that persons can hold securities in dissolved corporations, just as they can in live ones. A Florida statute refers to the dissolved corporation's "shareholders or persons interested[,]"[299] and case law recognizes the capacity for a dissolved corporation to have creditors.[300] These references seem contrary to the idea that filing for dissolution of a corporation automatically transmutes all forms of interests in the corporation or its capital structure.

In sum, there is no reason to think that kicking off the dissolution process transmutes securities in Florida corporations into a separate category of claims against the dissolved entity that are not covered by the Capitalization Representations. The most plausible reading is that one can be a "claimant" as an equity holder, creditor, or phantom equity holder in a dissolved Florida corporation. The claimant's status pre-dissolution affects their rights during the dissolution, at the least rendering it a "similar" right captured by the Capitalization Representations. Accordingly, as best one can tell, during the ongoing dissolution proceedings, Marquez continues to hold whatever claim to "5% ownership" he previously owned.

Sellers' point might be that after HControl Corporation completes its wind-down, it will cash Marquez out for his interest—so there is a cure forthcoming, even if it is not effective yet. But HControl Corporation's affairs are unlikely to wind down before the

---

[299] *Id.* § 607.1406(2)(g).

[300] *Continental Cas. Co. v. Cura Gp., Inc.*, 2005 WL 8155321, at *19 (S.D. Fla. Apr. 6, 2005) (referring in passing to "creditors of dissolved corporations").

debt financing commitment expires on June 9, 2023.[301] Florida dissolution proceedings take months to conclude, as Sellers conceded at trial.[302] And a dissolved corporation cannot give known claimants fewer than 120 days after the date that articles of dissolution have been filed to notice their claims against the dissolved corporation.[303] In other words, HControl Corporation's dissolution will not be complete by the time the financing commitment expires.[304] So if it delivers a cure, the cure is unlikely to arrive in time to be meaningful as to the Capitalization Representations.

In sum, for all intents and purposes, whatever right Marquez had before the dissolution, he has now. And the window is still open for him to assert his claims against HControl Corporation. Furthermore, it is possible, as Buyers noted in their March 1 letter, that HControl Corporation still holds third-party contracts that have not been assigned to HControl Holdings. Although the plan might have been a good faith effort to cure any breach, it did not work. Unfortunately, there is no analytical short-cut to the question of whether the Marquez issue constitutes a breach of the Capitalization Representations.

The analysis reverts to the primary question concerning the nature of Marquez's interests under the Software Agreement, which is governed by Florida law.[305] According

---

[301] Dkt. 147 at 13.

[302] *See* Trial Tr. at 522:4–7 (M. Clark); *see also* Fla. Stat. § 607.1405(1)(a)–(d).

[303] Fla. Stat. § 607.1406.

[304] HControl Corporation filed its articles of dissolution on February 23, 2023, meaning that the 120-day period will not expire until June 23, 2023. *See* JX-397. Meanwhile, the Buyers' debt financing commitment expires on June 9, 2023. *See* Dkt. 147 at 13.

[305] JX-3 at 3.

to Sellers, Florida legal principles of contract interpretation are substantially the same as Delaware law.[306] Buyers do not dispute this. The court has foregone independent research in the interest of time and applies Delaware contract principles.

The Software Agreement provides Marquez with "5% ownership of HControl Corporation to be distributed upon a liquidation event."[307] Both sides (rather humorously) claim that this language is completely unambiguous and clearly supports their position. Sellers say that the Software Agreement provides Marquez something akin to a distribution right or a contingent value right ("CVR"). Buyers argue that the Software Agreement provides Marquez an equity interest in HControl Corporation. In reality, both sides' interpretations are reasonable, rendering the language ambiguous. The court is therefore free to consider extrinsic landmarks in addition to the plain language of the Software Agreement to inform its meaning.

Ultimately, Sellers have the better side of this dispute. They root their interpretation foremost in the language of the Software Agreement, which provides that HControl Corporation "shall pay" Marquez.[308] Greenberg attorney Chris Turek testified that, typically, "you don't *pay* someone equity. So you *grant* someone equity."[309] In other Company records, the board consistently used the words "grant" and "issue" to describe

---

[306] *See* Sellers' Opening Posttrial Br. at 35 (citing *Crastvell Trading Ltd. v. Marengere*, 90 So.3d 349, 353 (Fla. Dist. Ct. App. 2012)).

[307] JX-3 at 3.

[308] *Id.*

[309] Turek Dep. Tr. at 123:17–24 (emphasis added).

56

conferring stock options.[310] The fact that payment is due upon a liquidation event reinforces the conclusion that "shall pay" refers to a right to a cash payment, because typically cash is what gets distributed in a liquidation.[311]

To contextualize this language, Sellers introduced the expert testimony of Professor Steven Davidoff Solomon on relevant industry custom and practice.[312] As he observed, "[i]n an M&A transaction, agreements are not created from scratch. Instead, they are based on provisions negotiated in prior deals and past practices" and lawyers "negotiate provisions with knowledge of these past practices."[313] For this reason, a court can consider custom and practice when evaluating the plain language of the agreement.[314]

---

[310] JX-23; JX-24; JX-25; JX-39.

[311] *See Liquidation*, Black's Law Dictionary (11th ed. 2019) (definition of liquidation as "[t]he act or process of converting assets into cash, esp. to settle debts"); *Liquidate*, Merriam-Webster Dictionary (definition of liquidate as "to settle (a debt) by payment or other settlement; . . . to convert (assets) into cash").

[312] *See* JX-535 (Solomon Expert Report); Trial Tr. at 393:1–469:8 (Solomon). I should note that, before trial, I was skeptical of the value of Professor Solomon's testimony because aspects of his report, highlighted in motion practice by Buyers, seemed to draw the sort of legal conclusions that are more appropriately within the purview of the court. My skepticism waned and I became a believer during trial, where he rightly and helpfully focused his opinions on custom and practice.

[313] JX-535 at 11 (citing Benjamin E. Hermaline *et al.*, 1 *The Law and Economic of Contracts, in* The Handbook of Law and Economics 1 (A. Mitchell Polinsky & Steven Shavell eds., 2007)).

[314] Although it is of no matter here given the ambiguities in the agreement, a court need not deem a contract ambiguous before turning to information concerning custom and practice. *See Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 2929552, at *4 (Del. Ch. July 23, 2010) ("There is no requirement that an agreement be ambiguous before evidence of a usage of trade can be shown.") (quoting *Restatement (Second) of Contracts* § 222, cmt. (b) (1981)).

Professor Solomon opined that the contractual right granted in the Software Agreement does not have the defining features of equity or an equity security (or even a security at all).[315] Although it includes a right to share in liquidation, which is a common feature of an equity security, it lacks voting rights, fiduciary rights, and appraisal rights, among others.[316] He concluded that the Software Agreement grants Marquez a CVR, or "a right that triggers payment upon a defined event such as an M&A transaction or a type of liquidation."[317]

Viewing the Software Agreement as a CVR tracks with Bustamante's testimony concerning the negotiation of the Software Agreement, which can be probative of the parties' contractual intent.[318] Bustamante and Marquez negotiated the Software Agreement.[319] Bustamante testified, credibly, that the language was intended to provide

---

[315] JX-535 at 58–61.

[316] *Id.* at 59, Figure P (noting that the following common features of equity securities are not present in the Software Agreement: "[a] definable and transferable interest," "evidenced by any form of certificate or instrument," "[v]oting rights," "[a] right to share in profits and revenue/dividend rights," "[a] right to vote on liquidation," "[c]ancelability in a merger," "[a]ppraisal rights," "[a] fiduciary duty from the company to the shareholder," "[a] right authorized by or specified as existing as an equity security (with attending rights) in the HControl Corp. Certificate of Incorporation," "[r]ights to bring litigation to enforce fiduciary duties").

[317] *Id.* at 61; *see also The Nasdaq Stock Market Rulebook*, Rule 5732, Nasdaq (2023), *available at* https://listingcenter.nasdaq.com/rulebook/nasdaq/rules (defining "CVRs" as "unsecured obligations of the issue, which provide for a possible cash payment . . . upon the occurrence of a specific event or events related to the business of the issues or an affiliate of the issuer.").

[318] *See, e.g., United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 (Del. Ch. 2007).

[319] Trial Tr. at 104:8–106:10 (Bustamante); *id.* at 533:4–536:12 (Marquez).

Marquez a right to a cash payment in the future and not a form of equity security. He testified that Marquez did not want stock, that Bustamante did not want to give him stock, and that they agreed that Marquez would be entitled to receive a payment if the software—housed in HControl Corporation—were sold.[320] Bolstering this testimony, in emails with Marquez around the time of Marquez's departure in 2016, Bustamante described the agreement as providing $6,000 per month: "[W]e would defer $3,000 for future payment and you would collect $3,000 in cash per month."[321] Characterizing the "5% ownership" as a form of "defer[ed] . . . future payment" is consistent with characterizing it as a CVR.

To be fair, Buyers' interpretation of the Software Agreement finds a good deal of support in the record. As stated above, Buyers' interpretation of the Software Agreement is reasonable. The agreement uses the phrase "5% ownership."[322] The term "ownership," particularly when accompanied by a percentage, often refers to an equity interest and not a CVR.[323] Bustamante referred to Marquez's interests as an "ownership" interest in the 2016 emails and referred to the interests as "equity" in memos he prepared for the purpose of

---

[320] *Id.* at 103:18–105:23 (Bustamante).

[321] JX-34 at 2; *see also id.* at 4 (explaining that Marquez would get 5% of proceeds from a sale of the software).

[322] JX-3.

[323] *See* Black's Law Dictionary, *Equity* (11th ed. 2019) (defining equity as "[a]n *ownership interest* in property, esp[ecially] a business") (emphasis added); Black's Law Dictionary, *Share* (11th ed. 2019) (defining a share as "[a]n allotted portion *owned by*, contributed by, or due to someone" or "represent[ing] an equity or *ownership interest*, depending on the usage) (emphasis added).

this litigation,[324] but it seems unlikely that Bustamante recognized the difference between terms like "ownership" and "equity" in the CVR he negotiated.[325]  Latham referred to the Marquez issue as a "capitalization issue" in early 2023,[326] but credible testimony from Latham lead negotiator on these statements reflect that he did not view Marquez's claims as colorable such that this reference was a shorthand for Buyers' claims.[327]  The record contains at least one capitalization table identifying Marquez as an "owner" of HControl

---

[324] In May 2016, the Company Group's then-President and COO (now CEO), Luis Rodriguez, was dissatisfied with Marquez's work product.  In an email to Marquez, Rodriguez stated that he wanted to "restructur[e]" how the Company would give him "projects and payments in the future."  JX-31 at 5.  In response, Marquez claimed that Bustamante told him that he was entitled to a paycheck "FOR LIFE, or until we sell the company and then we liquidate [Marquez's] stock."  *Id.* at 2.  Marquez wrote that he owned 5%, not just of HControl Corporation, but of the "whole thing," meaning the Company Group.  JX-31 at 2.  Rodriguez looped in Bustamante to the email exchange.  *Id.* at 1.  Bustamante reviewed the Software Agreement.  *Id.* at 2.  After a lengthy and unfriendly email exchange, the parties met, and Bustamante followed up on that meeting asking Marquez to confirm that his claims were limited to an interest in HControl Corporation, which Marquez did.  *See* JX-34, JX-35, JX-36.

[325] *See, e.g.*, Bustamante Dep. Tr. at 62:21–23 ("Q.  Who drafted [the Software Agreement] for you?  A.  I have no idea, but if I knew, I would kill him."); *id.* at 63:6–16 (answering a question as to why he said he would "kill" the drafter, "[b]ecause it doesn't reflect what the intention of the parties was. . . . [T]he intent was only to give him a cash payment if we sold the software to a third party.").

[326] *E.g.,* JX-339.

[327] Trial Tr. at 80:23–81:14 (Purohit) ("I do not think Mr. Marquez has an equity security.  But in the interest of trying to get a deal done, what I did was try to reassure Mr. Hawa that the capitalization indemnity would remain. . . . Thus, my use of those terms to reassure him that we can add some language what would address "unknown issues.").

Corporation, but it is isolated and Sellers challenge its authenticity.[328]  The Company

Group never treated Marquez as an stockholder.[329]

Ultimately, the preponderance of the evidence reflects that the right granted to

Marquez under the Software Agreement is a CVR—specifically, a right to a cash payment

upon a liquidation event in the amount of 5% of the value of HControl Corporation.

The question turns to whether this right falls within the definition of Equity

Securities or phantom equity captured by the Capitalization Representations.[330]  On this

---

[328] The challenged document, marked JX-11 in this litigation, includes an email and attachment purportedly between Bustamante, Rodriguez, Iqbal, and other Company employees in 2011.  The email chain shows Bustamante sending a spreadsheet to Rodriguez, who forwarded the document to Iqbal.  The spreadsheet purports to be a capitalization table for the Company Group and shows Marquez as a 5% owner of HControl Corporation and Iqbal as a 5% owner of Optical Telecommunications, Inc.  Sellers challenged JX-11's authenticity through the testimony of Bustamante and Rodriguez, who testified that they had no recollection of the document, that Iqbal had the power to manipulate documents in the Company's email system, and that Iqbal had first produced the document at his own deposition.  JX-11; *see also* Trial Tr. at 278:4–282:12 (Bustamante); *id.* at 290:17–294:5 (Rodriguez); Joint Schedule of Evid. at 1 (noting Sellers' objections to JX-11 under Delaware Rules of Evidence 802 and 1002); Sellers' Opening Posttrial Br. at 34 ("Sellers object to JX011's admission on authenticity grounds under D.R.E. 901.").

[329] Marquez Dep. Tr. at 116:19–117:16.  For completeness, it bears nothing that Marquez repeatedly referred to his interest as "stock" (*see, e.g.*, Marquez Dep. Tr. at 10:6–16; JX-31 at 2 (Marquez describing "my stock")), but he also claimed to own 5% of the entire Company Group and disclaimed reliance on rights under the Software Agreement (*see* Trial Tr. at 542:12–549:22 (Marquez); JX-31 at 2)).  It is hard to credit anything he said at any time.

[330] As Professor Solomon and Turek described during trial, the terms "phantom stock" and "phantom equity" refer to the same kind of interest, just in either a corporate or alternative entity context.  Trial Tr. at 407:8–21 (Solomon); *id.* at 618:21–619:5 (Turek).  This decision uses the phrases interchangeably because Buyers have argued that Marquez could have a claim against HControl Corporation (*i.e.*, phantom stock) or HControl Holdings

point, the term phantom equity comes to Buyers' rescue.[331]  Phantom equity, as typically

conceived, is an unsecured contractual right that takes on economic characteristics of the

employer's equity.  *Black's Law Dictionary* defines the related concept of a "phantom

stock plan" as a "long-term benefit plan under which a corporate employee is given units

having the same characteristics as the employer's stock shares.  It is termed a 'phantom'

plan because the employee doesn't actually hold any shares but instead holds the right to

value those shares."[332]  Other secondary sources are to the same effect:

- *Fletcher Cyclopedia of the Law of Corporations* provides: "Phantom stock is the grant of a right to the appreciation in the corporation's stock" that does "not actually result in the [employee] receiving shares of stock."[333]

- *Folk on the Delaware General Corporation Law* provides: Phantom equity gives the employee "an immediate stake in the company's future" while creating "no dilution of equity because stock is not issued."[334]

- *Guide to Executive Compensation* provides: "Phantom stock plans mimic the financial upside of being an owner without requiring an actual grant of shares."[335]

- *Business Planning: Financing the Start-Up Business and Venture Capital Financing* provides: "A 'phantom equity' plan usually is a cash

---

(*i.e.*, phantom equity) following the dissolution of HControl Holdings.  The naming conventions are largely a distinction without a difference in this case.

[331] Merger Agreement § 4.02.

[332] *Phantom stock plan*, Black's Law Dictionary (11th ed. 2019).

[333] 5 William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Corporations* § 2137.20 (2006).

[334] 1 Edward Welch *et al.*, *Folk on the Delaware General Corporation Law* § 157.08 (7th ed. 2023 supp.).

[335] Sharon Reece *et al.*, *Guide to Executive Compensation: Legal and Regulatory Compliance Issues* 43–44 (2022).

compensation plan that pays bonuses based on changes in the value of the company's stock."[336]

- *Employee Benefits Handbook* provides: "By offering a phantom stock plan, an employer can give key employees the benefits of stock ownership without sharing ownership of the company. . . . The phantom stock benefits are usually paid out in cash."[337]

Similar definitions appear in case law,[338] practical publications,[339] and law journals.[340]

The parties' witnesses understood phantom stock similarly. Sellers' counsel testified that phantom equity is "management compensation" that has "various attributes of stock."[341] Turek testified that "phantom stock or phantom equity typically refers to a contract right to receive some sort of payment in connection with a transaction or some

---

[336] Therese H. Maynard *et al.*, *Business Planning: Financing the Start-Up Business and Venture Capital Financing* 358 (3d ed. 2018).

[337] 2 Jeffrey D. Mamorsky, *Employee Benefits Handbook* § 56:20 (2008).

[338] *See, e.g.*, *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 357 (Del. 2013) (describing "phantom units" that "became immediately payable if a change of control occurred"); *Keystone Assocs. LLC v. Benjamin Fulton*, 2020 WL 3432601, at *4 (D. Del. June 23, 2020) (referencing "Phantom Stock for employees that would not share in profits but benefit at a liquidity event only").

[339] *See, e.g.*, National Center for Employee Ownership, *Phantom Stock and Stock Appreciation Rights (SARs)* (May 9, 2018), *available at* https://www.nceo.org/articles/phantom-stock-appreciation-rights-sars (defining "phantom stock" as "simply a promise to pay a bonus in the form of the equivalent of either the value of company shares or the increase in that value over a period of time"); 5 Robert Joe Hull *et al.*, *Representing Start-Up Companies* § 8:13 (2022 ed.) ("Pursuant to the terms of the phantom stock agreement, at some future date, typically subject to vesting, the phantom stock is settled in cash.").

[340] *See, e.g.*, Nithya Narayanan, *Activist Nominee Compensation: Balancing the Hedgehog's Dilemma*, 41 Del. J. of Corp. L. 345, 385 (2017) ("A phantom stock plan is an employee benefit plan that gives selected employees or directors many of the benefits of stock ownership without actually giving them any company stock.").

[341] Trial Tr. at 14:9–15:6 (Purohit).

other right to receive something in connection with a transaction."[342] Reiser testified that "phantom stock and phantom equity are contract rights entitling the recipient thereof to some payment or some amount of money at a future event or at a future time[.]"[343]

Sellers argue that the Software Agreement does not provide a form of "phantom equity" because that term refers to management compensation with other "attributes of stock."[344] They list, as examples, "dividends or voting rights."[345] In essence, Sellers argue that the Software Agreement does not grant phantom equity because it is not equity. But just like ghosts are not people, phantom equity is not equity, as reflected in the definitions listed above.

Because Marquez's interests fall within the definition of phantom equity, there is, in fact, "outstanding . . . phantom equity," rendering the Capitalization Representations false. There is no *de minimis* qualifier; Buyers negotiated for the Capitalization Representations to be "true and correct in all respects."[346] It is not true in all respects.

Tacitly conceding the strength of this conclusion, Sellers argue that Buyers raised their arguments based on phantom equity too late in this litigation and therefore waived it. Buyers first raised the argument in their pretrial brief. Although that point might be too

---

[342] *Id.* at 618:14–20 (Turek).

[343] *Id.* at 704:23–705:2 (Reiser).

[344] *See* Sellers' Opening Posttrial Br. at 40–41 (quoting *Phantom stock plan*, Black's Law Dictionary (11th ed. 2019)); Trial Tr. at 14:9–15:6 (Purohit); *id.* at 406:10–408:24 (Solomon).

[345] *See* Sellers' Opening Posttrial Br. at 40–41; Trial Tr. at 406:10–408:24 (Solomon).

[346] Merger Agreement § 7.01(a).

late in some litigation before this court, it was timely here. This case revved up from filing to trial in under two months—the complaint was filed on March 6, 2023, and the pretrial briefs were filed on May 3, 2023. It is hard to fault Buyers for not formulating all of their legal theories earlier. Moreover, the record suggests that Sellers anticipated this argument before the pretrial brief, thus mitigating any prejudice.[347] In all events, Sellers had the opportunity to respond in trial and through posttrial briefing, which they did ably. Sellers lost on the merits of the issue, not because Buyers raised it too late for them to prepare an adequate defense.

Given the court's finding that Marquez's right constitutes a form of phantom equity covered by the Capitalization Representation, it is unnecessary to reach the parties' dispute regarding the set of Capitalization Representations related to Equity Securities. Because this was Buyers' lead argument, to which the parties devoted considerable time, the court offers some observations on the issue.

The definition of Equity Securities is confusing. Two subsections of that definition are at issue—subsection (a) and subsection (b).

Recall that subsection (b) includes any "security, warrant, right, put, call straddle, option or other interest convertible into or exchangeable or exercisable for any of the

---

[347] *See, e.g.*, Trial Tr. at 14:9–15:6 (Purohit) (testifying about phantom equity in the auction draft); *id.* at 682:2–24 (Turek) (same); *id.* at 797:10–13 (Reiser) (testifying about Buyers' claim as to phantom equity).

65

foregoing, whether at the time of issuance or upon . . . the occurrence of some future event."[348]

Buyers say that the phrase "any of the foregoing" refers to the immediately preceding list found in subsection (b), which includes "security, warrant, right, put, call straddle, option."[349] Under Buyers' reading, subsection (b) covers any right (the Software Agreement's contingent value right) exercisable for any other right (cash payment) upon the occurrence of some future event (a liquidation).

Sellers say that the phrase "any of the foregoing" refers back to the list in subsection (a), which includes:

> capital stock, member interests, or equity security, certificate of interest, rights to profits or revenue and any other similar interest in a Person or participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, partnership interest, limited partnership interest, Limited Liability company interest, interest in a joint venture, or certificate of interest in a business trust. [350]

Although the list in subsection (a) is longer than that of subsection (b), it does not include the broad term "right," nor does it expressly cover CVRs or phantom equity. Also, as Sellers argue,[351] none of the terms in subsection (a) neatly describe the CVR at issue.

---

[348] Merger Agreement § 1.01.

[349] *Id.*

[350] *Id.*

[351] Sellers' Opening Posttrial Br. at 36–38; Sellers' Answering Posttrial Br. at 4–5.

Although variants of the "nearest reasonable antecedent" canon direct that "foregoing" refers to the nearest list—which is found in subsection (b)—that approach leads to the odd conclusion that the parties intended that subsection (b) capture any "right" that is convertible into another "right." Such a definition would result in an extremely broad definition of Equity Securities. Although Buyers' counsel testified that he was aiming for an extremely broad scope,[352] Sellers presented compelling custom and practice evidence that the language did not perfectly achieve Buyers' desired breadth.[353] Moreover, a "right" convertible into another "right" seems out of scope from concepts of "equity" and "securities" that the title of the definition suggests. Perhaps with more time, the court could solve this puzzle. This decision, however, offers no solution. In all events, given the analysis concerning "phantom equity," this decision does not resolve this other aspect of the dispute.

Buyers proved that Sellers breached the Capitalization Representations based on the Marquez issues.

### 2. Iqbal

Iqbal claims to hold three categories of interests relevant to the Capitalization Representations: options in HControl Holdings issued in 2012, 2013, and 2014 or 1,000 shares of stock issued when those options were canceled; warrants to buy shares in

---

[352] Trial Tr. at 694:8–9, 696:1–5, 696:19–697:6, 700:24–701:11 (Reiser); *id.* at 608:3–10, 615:4–11 (Turek).

[353] *Id.* at 403:7–406:4, 417:18–420:20 (Solomon); *see also* JX-535 at 26–31, 35–39.

HControl Holdings for $2.50 per share; and a 5% interest in OTI Fiber by virtue of a 2007 oral contract between him and Bustamante. Buyers argue that each of these interests render the Capitalization Representations inaccurate.

Iqbal bases his claim to options on a Membership Interest Plan (the "Plan") created in June 2011 for offering employees equity as a form of deferred compensation.[354] The Plan defines "Award" in relevant part as "the grant of any form of stock option . . . to a Participant."[355] In Section 7.2, the Plan provides that a participant must enter into an Award Agreement to receive an Award: "Each Award shall be evidenced by an Award Agreement, which shall specify the term of the Award, the number of Membership Interests to which the Award pertains, the restrictions to which the Award is subject, the Award's vesting schedule, and such other provisions as the Committee shall deem appropriate."[356] The Plan defines "Award Agreement" as "an agreement entered into by and between a Participant and the Company, setting forth the terms and conditions applicable to an Award."[357]

In 2011, 2012, and 2013, the members of the HControl Holdings Board adopted Unanimous Written Consents providing that "the Company shall issue" grants pursuant to the Plan.[358] As O'Naghten testified, "the board would meet yearly to consider executive

---

[354] JX-15.

[355] JX-14 at 2.

[356] *Id.* at 4.

[357] *Id.* at 2.

[358] JX-19; JX-24; JX-25.

68

compensation, at which time it would consider authorizing the issuance of stock options."[359] Those consents provided, respectively, that Iqbal "shall" receive grants of options for the following: 75,000 shares with a strike price of $1.50 per share effective January 1, 2012;[360] 12,000 shares with a strike price of $2.50 per share effective January 1, 2013;[361] and 12,000 shares with a strike price of $2 effective January 1, 2014.[362] Iqbal was never presented with any Award Agreement as contemplated by the Plan.[363]

Sellers advance the syllogistic argument that no Company employees ever received options pursuant to the Plan because the Plan required an employee to execute an Award Agreement to receive options and no employee (save one, whose interests are not at issue) ever executed an Award Agreement.

Bustamante was emphatic that he did not present employees identified in the 2011, 2012, and 2013 Unanimous Written Consents with Award Agreements and his failure to do so was intentional—he wanted to avoid granting those employees options. Bustamante testified that he could unilaterally decide not to grant options, even though the board said that they "shall" be issued. He claimed that he had "the power to veto the board's

---

[359] Trial Tr. at 332:3–9 (O'Naghten). He testified that the Board's decision would be "documented in the minutes," but it appears that they were documents in the form of Unanimous Written Consents. *Id.*

[360] JX-19.

[361] JX-24.

[362] JX-25.

[363] Trial Tr. at 573:16–24 (Iqbal).

decisions" as CEO and manager,[364] although the HControl Holdings Operating Agreement says the opposite.[365] O'Naghten testified to the same effect—that no one ever received options,[366] and that the Board gave Bustamante the discretion to award the options because he owned two-thirds of the Company.[367] Because Bustamante never presented Award Agreements to the awardees, Sellers say that there were no outstanding options pursuant to the Plan.

Having spent a few days in their presence, the court can say that Bustamante and O'Naghten seem like good men and were credible witnesses generally. Their testimony on this point, however, was unconvincing. This is so for a number of reasons.

For starters, O'Naghten is an accomplished attorney. He drafted the Unanimous Written Consents. He selected the language "shall" and not language (like "may") indicating that the options would be granted upon Bustamante's discretion.[368]

---

[364] *Id.* at 241:11–15 (Bustamante).

[365] JX-9 (requiring Bustamante to execute "any and all decisions of the board of directors where the board of directors is acting within its area of competency"). Bustamante's employment agreement requires that he serve the Company "faithfully and diligently according to the terms of the Company's Operating Agreement." JX-10.

[366] *See, e.g.*, Trial Tr. at 338:17–18 (O'Naghten).

[367] *Id.* at 332:7–9, 333:19–334:3 (O'Naghten); *see also id.* at 243:24–244:4 (Bustamante) ("I just deferred doing it until finally it got to the point where we got to get rid of this thing. And then we had a board meeting, and I got the board to terminate the incentive plan or the stock option plan before the options were ever issued.").

[368] *Id.* at 342:15–343:9 (O'Naghten).

Also, multiple capitalization tables created by the Company reflect that all option awardees identified on the Unanimous Written Consents, including Iqbal, were granted options.

- In 2015, 2016, and 2018, the Company updated the HControl Holdings capitalization table. Each version reflects that Iqbal's options were granted.[369]

- On October 28, 2022, Matthew Rogers created a spreadsheet reflecting that Iqbal holds 3,000 options.[370] The October 28 spreadsheet reflected the "HControl Holdings LLC Schedule of Employee and Director Stock Option Grants as of December 31, 2017."[371] O'Naghten testified that the spreadsheet was reliable and that he had no reason to disagree with its data.[372] The spreadsheet shows that Iqbal was granted and held 3,000 options in HControl Holdings as of December 31, 2013.[373]

- On February 1, 2023, O'Naghten created a spreadsheet to track the HControl Holdings capitalization table,[374] and it too reflected that Iqbal was granted options in 2012, 2013, and 2014.[375] During trial, O'Naghten claimed this

---

[369] *See, e.g.*, JX-23 (spreadsheet created by Bustamante titled "Stock Option Grants As Of December 2013"); JX-26 (spreadsheet created on January 12, 2015 titled "Stock Option Grants To Date"); JX-28 (spreadsheet created on April 7, 2015 titled "Schedule of Employee and Director Stock Option Grants"); JX-30 (January 2016 email attaching the "official spreadsheets as approved with Bill [Davis]," which shows that Iqbal held 65,250 unexpired options); JX-33; JX-545 (June 2016 spreadsheet calculating that Iqbal held 65,250 unexpired options); JX-38 (February 1, 2018 spreadsheet titled "Stock Option Grants as of December 31, 2017"); *see also* JX-44 (Feb. 1, 2023 spreadsheet prepared by O'Naghten showing that options had been issued under the Plan).

[370] JX-38. Rogers is a former board member and CFO of HControl Holdings who pled guilty to tax fraud. Trial Tr. at 121:5–10 (Bustamante). Rogers thereafter resigned from his director and CFO positions. *Id.* at 121:11–21 (Bustamante).

[371] JX-38.

[372] O'Naghten Dep. Tr. at 108:4–109:18.

[373] JX-38.

[374] *See* JX-44; Trial Tr. at 359:14–23 (O'Naghten).

[375] JX-44.

spreadsheet was not "a reflection of reality," and instead was only to help him understand "the worst-case scenario against the company."[376] O'Naghten also attempted to explain that his spreadsheet was incorrect because it did not account for Iqbal's employment being terminated as of January 3, 2014, at which point any unvested options were cancelled.[377] Even accepting that premise for the purpose of argument, O'Naghten agreed that 3,000 of Iqbal's options would have vested and would not have been cancelled.[378]

Also, Sellers repeatedly described Iqbal as an "awardee" who "got options" in communications with Latham in January and February 2023. In response to Latham's January 20 request for information, O'Naghten called Iqbal an "awardee," emailing that "[t]he only 'awardees' that have not signed this release are Ruben Perez Sanchez and Wajid Iqbal."[379] In another email chain between counsel concerning Iqbal and other issues, Purohit stated: "Think only one or two people that are not sellers that got options and that's basically Ruben" (whose interests are not at issue) "and Wajid."[380] By December 12, 2022, Bustamante continued to describe Iqbal as a "loose end" that he needed to tie up for the merger to close.[381]

Moreover, Sellers claim that the Plan was terminated in 2017 and that all options issued pursuant to the Plan were cancelled at that time. Section 10.1 of the Plan permits

---

[376] Trial Tr. at 360:21–361:5 (O'Naghten).

[377] Trial Tr. at 362:19–24 (O'Naghten); JX-297.

[378] Trial Tr. at 363:10–14 (O'Naghten).

[379] JX-289.

[380] JX-296.

[381] JX-715.

the HControl Holdings Board to terminate the Plan,[382] and the record reflects that the board did so on January 18, 2017.[383] O'Naghten testified that Bustamante was "doing away with the whole concept of options" to grant "executives a direct participation in the company and then arranging for a disproportionate distribution on sale."[384] According to the minutes of the January 18 board meeting, the Board resolved that "*all options previously granted* [under the Plan] are . . . cancelled and nullified" and that "*each holder of Terminated Options* is hereby issued 1,000 Shares of the capital of the Company and OTI Fiber LLC[.]"[385]

The January 18 board resolutions raise obvious questions: Why terminate options that were never granted? Why go to the next step and define the term ("Terminated Options") or refer to option holders ("each holder of Terminated Options") for a null set?

Perhaps the most harmful fact for Sellers' argument is that, after the Board cancelled "all options previously granted" and resolved that "each holder of Terminated Options is hereby issued 1,000 Shares of the capital of the Company," O'Naghten received 1,000

---

[382] JX-14 at 41.

[383] JX-39; Trial Tr. at 250:23–10 (Bustamante).

[384] Trial Tr. at 336:10–16 (O'Naghten); *see also id.* at 251:16–24 (Bustamante) (testifying that he had told the Board, "I'd like to have more flexibility in incentivizing the management team").

[385] JX-39 at 2 (emphasis added).

shares.[386] Like Iqbal, O'Naghten was listed on the Unanimous Written Consents. Like Iqbal, O'Naghten never received nor signed an Award Agreement.[387]

As the above discussion of the Marquez issue reflects, sometimes Sellers said things over the course of the Company's history that they did not mean—like stating that Marquez held stock when he did not. And a degree of informality in recordkeeping is to be expected in a privately held start-up like the Company Group. But this issue is different. Here, the Company seems to be opportunistically seizing, in this litigation, on its historical penchant for business informalities to deny the business reality. In all events, Sellers' syllogistic argument falls short.

The parties partially briefed Florida law concerning Iqbal's claims. Many possible conclusions could be drawn. For example, perhaps the Board's 2017 resolution was self-effectuating, and Iqbal was in fact issued 1,000 shares at that time.[388] Buyers argue that it is possible that Iqbal held 1,000 shares because a promise of share ownership is sufficient, under Florida law, to vest share ownership.[389] If Iqbal holds 1,000 shares, then he holds "capital stock" captured by subsection (a) of the definition of Equity Securities and subject

---

[386] Trial Tr. at 367:24–368:4 (O'Naghten).

[387] *Id.* at 367:12–14 (O'Naghten).

[388] JX-298.

[389] Buyers' Opening Posttrial Br. at 45 (citing *Acoustic Innovations, Inc. v. Schafer*, 976 So.2d 1139 (Fla. Dist. Ct. App. 2008)).

to the Capitalization Representations.[390] Alternatively, even if the January 18, 2017 board action was insufficient to grant Iqbal 1,000 shares, then he arguably has a "right" to 1,000 shares captured by subsection (b) of the definition of Equity Securities and subject to the Capitalization Representations.[391]

In the end, whether Iqbal's options give rise to a breach presents a really close call. Although Iqbal likely has viable claims for *something* involving the Company Group as a consequence of the 2011, 2012, and 2013 options, Buyers have not briefed the law sufficiently to bear their burden of proving that they contracted for the right to terminate the Merger Agreement based on this aspect of Iqbal's claim. Perhaps this was because they viewed Iqbal as less of a business risk than Marquez and thus easily addressed in the event Buyers were ordered to close. Perhaps the clock just ran out.

Buyers' other claims for breach based on Iqbal are similarly unsuccessful. Iqbal bases his claim for warrants on a June 14, 2012 promissory note.[392] On June 14, 2012, Iqbal (through his company, NGN Engineering) was issued a signed promissory note that governed the repayment of a $33,300 loan he made to HControl Holdings LLC, and he

---

[390] Merger Agreement § 1.01 (subsection (a) to definition of "Equity Securities" covering "capital stock"); *id.* § 4.02 (representing that that Schedule 4.02 is complete as to the Purchased Entities and that all of the Company Group subsidiaries are "wholly owned").

[391] *Id.* § 1.01 (subsection (b) to definition of "Equity Securities" covering any "right . . . convertible into or exchangeable or exercisable for any of the foregoing"); *id.* § 4.02 (representing that that Schedule 4.02 is complete as to the Purchased Entities and that all of the Company Group subsidiaries are "wholly owned").

[392] JX-21.

signed a related subordination and standstill agreement.[393]  The promissory note provided

that:

> [HControl Holdings, LLC] shall issue to [Iqbal], on or before June 30, 2012, a warrant to purchase 2,664 Shares, as such term is defined in the Operating Agreement of Borrower effective as of January 1, 2010, which warrant shall provide for a strike price equal to $2.50 per Share and a termination date of June 30, 2017.[394]

Iqbal did not exercise the warrants before June 30, 2017.[395]  He is not entitled to do so now.  Those warrants are not outstanding and do not constitute a breach of the Capitalization Representation.

Iqbal also claims to own 5% of Optical Telecommunications on an alleged oral agreement with Bustamante.[396]  According to Iqbal, when he was hired in 2006, Bustamante agreed to pay Iqbal "$3,500 every two weeks and . . . five percent equity" in OTI Fiber.[397]  Iqbal accepted the offer.[398]  In this action, Iqbal produced a spreadsheet that he claims was sent to him in 2010 by Bustamante.[399]  In the email, Bustamante memorialized Iqbal's ownership in a spreadsheet from 2010 titled "Entity Ownership

---

[393] *Id.* at 71, 75, 82.

[394] *Id.* at 74.

[395] Trial Tr. at 579:4–22 (Iqbal).

[396] JX-11.

[397] Trial Tr. at 565:4–16 (Iqbal).

[398] *Id.*

[399] JX-11.

Structure and Role."[400] Bustamante's CEO, Rodriguez, supplied the spreadsheet to Iqbal and noted "[y]ou may need this one day."[401] Sellers dispute the authenticity of this document.[402] The evidence on this point is underdeveloped, as are the legal arguments concerning their significance. It suffices to say that Buyers bear the burden of proof on this issue too and they have failed to meet it.

Buyers failed to prove that Sellers breached the Capitalization Representations based on the Iqbal issues.

### B. Buyers' Claims That Sellers Breached Interim Operating Covenants

As another basis for termination, Buyers argue that Sellers breached interim covenants through the transfer-dissolution plan and the attendant Indemnity Agreement. Recall that the plan went as follows: Sellers (1) transferred the software held by HControl Corporation to HControl Holdings, (2) set up a trust in the amount of $215,000 with an indemnity from Bustamante to HControl Corporation to cover any future claims by Marquez, and (3) dissolved HControl Corporation.

Buyers argue that various steps in this plan violated the following provisions in the Merger Agreement. First, they argue that the plan violated Section 6.01(a)(A),[403] which requires Sellers to operate the Company Group in the Ordinary Course of Business between signing and closing. Second, they argue that the plan violated Section 6.01(a)(B)(1), which

---

[400] *Id.*

[401] *Id.*; Trial Tr. at 570:15–20 (Iqbal).

[402] Sellers' Posttrial Opening Br. at 34.

[403] Merger Agreement § 6.01(a)(A).

required Sellers to cause the Company Group to use commercially reasonable efforts to preserve intact the business organizations therein.[404] Third, they argue that the plan violated Section 6.01(b)(xi), which prohibits Sellers from entering into or modifying "any Contract with any Affiliate of the Company Group (other than within the Company Group)" without Buyer's consent.[405] Fourth, they argue that the plan violated Section 6.01(b)(v), which prohibits Sellers from dissolving "any member of the Company Group (other than intra-company mergers or a dissolution of immaterial Subsidiaries)" without Buyers' consent.[406] Sellers deny that their good-faith effort to cure the Marquez issue breached any interim covenant.

### 1. Ordinary Course Of Business

Section 6.01(a)(A) required Sellers to "cause the Company Group to . . . conduct its and their respective Businesses in the Ordinary Course of Business in all material respects."[407] "Ordinary Course of Business" means "the ordinary course of Business as conducted by the Company Group in accordance with past practice."[408] "Business" is defined in the Merger Agreement as "the business of the Company Group, including, without limitation, the business of wired telecommunications services, whether regulated or non-regulated, including private line, competitive access, broadband, local, long

---

[404] *Id.* § 6.01(a)(B)(1).

[405] *Id.* § 6.01(b)(xi).

[406] *Id.* § 6.01(b)(v).

[407] *Id.* § 6.01(a)(A).

[408] *Id.* § 1.01.

distance, cable or other video, voice over internet protocol and internet access services, within the State of Florida."[409] "In all material respects" has been interpreted by this court to mean that any deviation must "significantly alter the total mix of information available to the buyer when viewed in the context of the parties' contract" to be considered a breach.[410] The general purpose of an ordinary-course-of-business covenant is to "help ensure that the business the buyer is paying for at closing is essentially the same as the one it decided to buy at signing."[411]

Buyers argue that neither transferring the software nor dissolving HControl Corporation was in the Ordinary Course of Business,[412] and that Sellers breached Section 6.01(a)(A) by doing so.

The transferred software was significant to the Company Group by all accounts. The software was critical to ensuring the operation of the Company's business,[413] because "obviously, you need billing software" to provide services to the Company's approximately 30,113 subscribers.[414] In pitches to potential buyers, Sellers advertised that the "software automates virtually all business practices from provisioning to reporting."[415]

---

[409] *Id.*

[410] *Dermatology Assocs.*, 2020 WL 4581674, at *26.

[411] *Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021).

[412] Buyers' Opening Posttrial Br. at 55–62.

[413] JX-339.

[414] JX-508; Trial Tr. at 101:16–102:7 (Bustamante).

[415] JX-73 at 79.

It was "designed from the ground up" and "has complete functionality to manage current and future commercial business growth."[416] Bustamante valued the software at $9.5 million, or 4% of the total deal value.[417]

Although the software was material, the Business was not altered by the transfer because the Company Group still held the software. Before and after the transfer, the Company Group owned the same assets and had the same contracts.[418] After the transaction, the Merger Agreement still entitled Buyers to purchase OpticalTel, a telecommunications company that has existing long-term contracts to provide its services to communities in Florida, a regulated entity that has the required certifications with the state of Florida, and a proprietary software that helps run the business. In other words, the Business that Buyers had planned to purchase was essentially the same as it was at the time of signing.

---

[416] *Id.* at 74.

[417] Bustamante Dep. Tr. at 42:22–25 ("Q. What are you valuing for that 9.5 million valuation? A. The stock of HControl Corporation whose only asset is the software."). Antin's expert witness, Gregory Campanella, estimates the fair market value of HControl Corporation to fall between $10.31 to $11.57 million, and the fair market value of the software to be $10.57 million. *See* JX-512 (Expert Report of Gregory Campanella). These valuations are between 4.5% and 5% of the total deal value and are significant in the context of the overall transaction, where Buyers negotiated a dollar-zero indemnity for any breaches of the Capitalization Representation. *New Enter. Assocs. 14, L.P. v. Rich*, 2023 WL 2417271, at *35 (Del. Ch. Mar. 9, 2023) (identifying one source of reference for materiality as the "magnitude of the basket that parties agree to for purposes of deal-related indemnification, because the size of those limits indicates the magnitude of loss that a party is willing to swallow before it can assert a claim to recover"); *Harris v. Harris*, 2023 WL 115541, at *12 & n.6 (Del. Ch. Jan. 6, 2023) (noting that studies of basket amounts suggest a rule of thumb of 0.5% to 1% of deal value for materiality).

[418] Trial Tr. at 176:13–177:1 (Bustamante).

Buyers further argue that transferring the software exposed the Company Group to claims of fraudulent transfer by Marquez, enhancing the materiality of the actions. It is unclear whether the threat of a claim by Marquez challenging the transfer-dissolution plan could transmute that plan into a Business-altering transaction that violated the Ordinary Course of Business. But assuming for argument's sake that this is a viable legal argument, it does not work factually. It is true that Marquez was "very intent on being very aggressive"[419] and told Buyers and Sellers repeatedly that he "would not go away."[420] During his trial testimony, Genesier credibly expressed concern that public litigation over fraud could impugn Buyers' reputation.[421] And the court is sensitive to this issue— Delaware law recognizes that concerns over reputational harm are legitimate because they can significantly harm a business.[422] Here, however, Marquez's persistence should concern no one. Marquez has a CVR under the Software Agreement, and Sellers established a trust and the Indemnity Agreement in the dissolution to cover the value of his CVR. Marquez's irrational threats do not give rise to a claim that could threaten harm that concerns Buyers.

---

[419] Genieser Dep Tr. at 228:22–229:5.

[420] JX-218; JX-542.

[421] Trial Tr. at 916:15–24 (Genieser) ("[I]t seemed like it could be a very public case and be picked up in local press and others which we thought could have a detrimental effect on the long-term value of the business.").

[422] *See, e.g.*, *In re Shawe & Elting LLC*, 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015) (countenancing "harm to a corporation's reputation, goodwill, customer relationships, and employee morale").

Buyers failed to prove that Sellers breached Section 6.01(a)(A).

### 2. Preserve Intact The Business Organizations

Section 6.01(a)(B)(1) required Sellers to cause the Company Group to "use commercially reasonable efforts to . . . preserve intact in all material respects its and their present business organizations."[423] Preserving a business organization requires a company to maintain the operations and relationships inherent in a business structure.[424] "Gutting" a business organization does not satisfy the requirement to preserve it.[425]

Defendants argue that Sellers gutted HControl Corporation by removing its sole asset and then dissolving the entity, but, as stated above, neither the transfer nor the dissolution materially altered the Company Group's Business. For that reason, it is difficult to find that doing so failed to preserve intact the Company's Group's Business in all material respects.

Buyers failed to prove that Sellers breached Section 6.01(a)(B)(1).

### 3. Contracts With Affiliates

Section 6.01(b)(xi) provides that Sellers may not "enter into or modify any Contract with any Affiliate of the Company Group (other than within the Company Group)" without Buyer's consent (not to be unreasonably withheld).[426] The Merger Agreement defines

---

[423] Merger Agreement § 6.01(a)(B)(1).

[424] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *15–16 (Del. Ch. Oct. 31, 2014).

[425] *AB Stable*, 2020 WL 7024929, at *79.

[426] Merger Agreement § 6.01(b)(xi).

"Affiliate" to include "any other Person that, directly or indirectly through (1) or more intermediaries, controls, or is controlled by, or is under common control with, such Person and the term 'control' . . . means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies" at both entities.[427]

Buyers argue that Sellers breached this provision when HControl Corporation entered into the Indemnity Agreement with Bustamante. Bustamante is an Affiliate of HControl Holdings and HControl Corporation because he has "the power to direct or cause the direction of the management and policies" at both entities.[428] Sellers do not dispute these facts.

Sellers argue, however, that the Indemnity Agreement was part of the Company Group's efforts under Section 6.01(b) of the Merger Agreement. Section 6.01(b) permits Sellers to take "reasonable action" in response to "unforeseen" "operational matters"[429] upon notice to Buyers. Sellers further observe that (xiv) of Section 6.01(b) expressly permits "transfers among the Company Group."[430]

Sellers have shown that the Indemnity Agreement was an "action[] taken in response to an emergency or other unforeseen and urgent operational matter"—namely, Marquez.[431] While Sellers had known about Marquez's claim for some time, it was

---

[427] *Id.* § 1.01.

[428] *Id.*

[429] *Id.* § 6.01(b).

[430] *Id.* § 6.01(b)(xiv).

[431] *Id.* § 6.01(b).

"unforeseen" that he would continue to pursue his claims, refuse to settle, and attempt to hold up the sale so adamantly. Sellers gave Buyers notice of their plan of action in their February 17 letter, as required by Section 6.01(b). The fact that the transfer was from HControl Corporation to HControl Holdings, both members of the Company Group, adds further evidence against Buyers' claim. Under Section 6.01(b)(xiv), there need not have even been an unforeseen operational matter for Sellers to properly transfer an asset in excess of $50,000 to another member of the Company Group.

This result makes sense. As discussed above, the transfer and dissolution did not change the OpticalTel Business that Buyers had contracted to purchase; nor did the Indemnity Agreement.

Buyers failed to prove that Sellers breached Section 6.01(b)(xi).

### 4. Dissolution Of A Material Subsidiary

Section 6.01(b)(v) provides that Sellers may not "adopt a plan or agreement of complete or partial liquidation or dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any member of the Company Group (other than intra-company mergers or a dissolution of immaterial Subsidiaries)" without Buyers' consent (not to be withheld unreasonably).[432]

Defendants argue that HControl Corporation was a material Subsidiary, and that was true before the transfer. But HControl Corporation ceased being a material Subsidiary after Sellers transferred the assets.

---

[432] *Id.* § 6.01(b)(v).

Because Section 6.01(b)(v) permits dissolution of immaterial subsidiaries, Buyers failed to prove that Sellers breached Section 6.01(b)(v).

## C. Buyers' Claim That Sellers Breached The No-Shop Provision

Section 6.18 prohibited Sellers and their representatives from taking "any action to encourage, initiate or engage in discussions or negotiations with, or provide any information to, any Person (other than the Buyer and the Buyer's representatives) concerning any transaction similar to the Transactions."[433]  Section 6.18 requires Sellers and their representatives to "terminate any and all negotiations or discussions with any third party regarding any proposal" concerning such a transaction.[434]  Buyers claim that, instead of working to resolve the Marquez issue, Sellers solicited a "backup" buyer in breach of Section 6.18. Buyers rely on emails, texts messages, and communications beginning in January and continuing through February that reference a "backup" plan. Sellers adamantly disclaimed this at trial.[435]

Buyers have proven that, in late January, Bustamante was looking for a backup plan, and certain Sellers were stating that Bustamante had one.  In January, Bustamante had asked Lazard about "the prospects of selling OpticalTel if the Antin deal didn't close,"[436]

---

[433] *Id.* § 6.18(a).

[434] *Id.*

[435] *See* Trial Tr. at 185:5–186:10 (Bustamante); *id.* at 488:13–489:1, 492:10–493:2 (M. Clark); *see also* Baker Dep. Tr. at 81:18–82:7, 84:4–17.

[436] Trial Tr. at 601:23–602:10 (Baker).

and Lazard had a call with the auction runner-up on January 15.[437] Baker testified that he did not recall why he had this call.[438] By January 20, Bustamante had again spoken to Lazard and texted Rodriguez that he was "trying to decide on a plan . . . in case . . . Marquez kills this deal."[439]

Shortly after, Sellers began talking about a backup plan as if one had materialized. On January 21, Rodriguez told his team that there were "other plans in place if this [deal] does not happen."[440] Later in January, one of Sellers' main investors contacted Marquez and told him there was a "backup plan" that "involved conversations with a different buyer."[441]

Hoffman similarly referenced a "backup plan" in a February 10 letter to the Company's Florida counsel.[442] According to Hoffman, Latham claimed that Sellers had "a backup buyer" and had "informed the backup buyers about . . . Marquez."[443] Latham also stated that "Marquez will not affect this backup transaction," but "the backup deal will be for $15 to $20 Million dollar less."[444] One of the "key take aways" from the call with

---

[437] JX-264.

[438] Trial Tr. at 600:18–601:22 (Baker).

[439] JX-284.

[440] JX-286.

[441] Trial Tr. at 556:14–20 (Marquez).

[442] JX-359.

[443] JX-355.

[444] *Id.*

Sellers' counsel was that "OpticalTel has a second buyer lined up."[445]  Sellers responded to this letter and did not deny Hoffman's account.[446]  On the other hand, Hoffman's account is hearsay within hearsay and hard to give much weight.[447]

On February 24, Mark Clark texted Bustamante that he was "sitting right now with a preferred equity/debt investor.  Didn't disclose name but confirmed appetite and cost of capital.  Backup to backup plan."[448]  Defendants infer that Mark Clark was soliciting another potential bidder.  They read this text to mean that Sellers had both a backup buyer and a backup plan to the backup buyer.  But Mark Clark credibly dispelled aspects of this theory at trial, testifying that the backup to the backup plan involve obtaining debt financing form another party.[449]  Mark Clark did not explain his reference to the original backup plan.

The "backup plan" communications described above raise suspicions, but they do not support a finding of breach.  The most troubling fact from this period is that Lazard spoke to the auction runner-up.  That, standing alone, does not constitute breach.  The other evidence on which Buyer relies does not strengthen its case.  Rodriquez's statement to

---

[445] *Id.*

[446] *See* JX-366.

[447] Hoffman consistently used colorful and exaggerated language in his communications with Sellers, and this court therefore takes his accounts with a grain of salt.  Further, Delaware Rule of Evidence 805 recognizes that hearsay within hearsay can only be admitted if each part of the combined statements conforms with an exception to the rule. D.R.E. 805.

[448] JX-395.

[449] Trial Tr. at 489:15–493:2 (M. Clark).

management seems likely intended to buoy their spirits. The Sellers' investor's statement to Marquez seems likely intended to dampen Marquez's spirits. Mark Clark's text about the backup backup plan does not prove the existence of either. Buyer has failed to prove breach based on the "backup plan" conversations.

Buyers also point to the fact that, on March 5, Sellers' litigation counsel requested that Buyers agree to a "one-week standstill agreement" that would allow Sellers "to contact other potential buyers to assess interest in buying OpticalTel,"[450] as evidence of the fact that Sellers were already contacting other potential bidders. The fact that Sellers requested leave to engage other bidders does not mean that they did so.

Buyers failed to prove that Sellers breached Section 6.18.

### D. Sellers' Claims That Buyers Breached The Merger Agreement

Sellers claim that buyers breached the Merger Agreement in multiple ways, but most of Sellers' claims are mooted by the above analysis.[451] Only two remain. First, Sellers claim that Buyers breached Section 6.02 by directly contacting Marquez without Bustamante's written consent. Second, Sellers claim that Buyers breached Section 6.04 by failing to use their "best efforts" to consummate the merger.

---

[450] JX-485.

[451] Sellers claim that Buyers breached Sections 2.02 and 2.03(b) by failing to close and Section 8.01 by terminating the Merger Agreement, but this decision finds that Buyers had a valid basis for failing to close and terminating the Merger Agreement. Also, Because the transfer-dissolution plan did not give rise to a breach of an interim covenant, Sellers' claim that Buyers breached Section 6.01 by unreasonably withholding consent to the plan is a non-issue.

### 1. Contact With Marquez

Section 6.02 provides that Buyers shall not, "without the prior written consent of the Sellers' Representative" Bustamante, contact any "Person whom any member of the Company Group has or has had a business relationship."[452]

Sellers claim that Buyers breached this provision when Greenberg called Marquez on January 9, 2023. Turek credibly testified that the purpose of this call was to convince Marquez to stop contacting Buyers.[453] Marquez had contacted Genieser directly only three days earlier, and Buyers still lacked critical information about who Marquez was and what his potential claims might entail. The call lasted no more than 15 minutes, and the conversation stopped as soon as Marquez informed Buyers that he was represented by counsel.[454] Though Sellers' argument is not frivolous, it is hard to imagine how this conversation could constitute a material breach of the Merger Agreement. The relative insignificance of this issue is reflected in trial and briefing time devoted to it.

Sellers failed to prove that Buyers breached Section 6.02.[455]

### 2. Best Efforts

Section 6.04(a) requires the parties to "use their best efforts to take, or cause to be taken, all actions, and to do, or cause to be done as promptly as practicable, all things

---

[452] Merger Agreement § 6.02.

[453] Trial Tr. at 686:13–15 (Turek).

[454] *Id.* at 687:5–688:9 (Turek).

[455] Sellers do not take issue with Greenberg speaking to Hoffman. That is because Section 6.02 does not preclude contact with Marquez's representatives. Merger Agreement § 6.02.

necessary, proper and advisable under applicable Laws to . . . cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transaction."[456] Sellers claim that Buyers breached the best-efforts provision in Section 6.04(a) of the Merger Agreement, although the grounds for this claim are not totally clear.

An efforts clause does not "require the identified outcome."[457] "Rather, it requires parties to try to achieve the identified outcome."[458] Even a "best efforts" obligation "is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun."[459] This is because "the concept of acting for the benefit of another is a fiduciary standard, not a contractual one."[460]

Here, Buyers used their best efforts to close even after learning about Marquez on January 6, 2023.

- As of January 23, Antin had requested to open up the OpticalTel investment to a co-invest process, a "pretty clear indication that [Antin and buyers] were continuing to . . . drive the process forward with regards to closing."[461]

---

[456] Merger Agreement § 6.04(a).

[457] *Dermatology Assocs.*, 2020 WL 4581674, at *22.

[458] *Id.*

[459] *All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 763 n.60 (Del. Ch. 2009).

[460] *Akorn*, 2018 WL 4719347, at *91.

[461] Genieser Dep. Tr. at 220:14–17; JX-292.

- As of January 25, Buyers were "setting up appointments for [Rodriguez] and telling him it's okay to sign some contracts and to close on an acquisition of a couple of very attractive properties."[462]

- On January 25, Buyers agreed to a common interest agreement to review the Latham memo regarding Marquez.[463]

- As Sellers told Buyers they were settling with Marquez, Buyers were "still working on funds flows, and working with our lenders to finalize the credit agreement."[464]

- On February 1, Genieser met with Bustamante "to try to find a path forward to getting this done."[465]

- On February 1, Genieser "reiterated how excited [Buyers] were to buy the company."[466]

- On February 1, after the Investment Committee was briefed on the Kroll report, Buyers "were still trying to get this deal to close."[467]

- On February 3, Sellers acknowledged internally that Buyers "want to proceed with a closing as quickly as possible."[468]

These are not the indicia of a buyer with cold feet.

Sellers' claim is reduced to a contention that Buyers were required to do more to solve the capitalization issues. But that is an overreach. Between signing and closing, Buyers had the right not to close if Section 4.02 was not true and correct in all respects.[469]

---

[462] JX-304.

[463] JX-310; JX-311.

[464] Trial Tr. at 723:15–724:9 (Reiser).

[465] Genieser Dep. Tr. at 268:6–12.

[466] JX-353.

[467] Crosbie Dep. Tr. at 159:3–7.

[468] JX-353.

[469] Merger Agreement § 7.01(a).

That flat Bring-Down Provision was specifically negotiated by the parties, with Sellers trying three times to impose a materiality qualifier before ultimately accepting the risk of the deal not closing if the Capitalization Representations were not true in all respects. The best-efforts provision does not require Buyers to sacrifice their negotiated contractual rights to solve a breach.[470] If that were the case, pre-signing diligence, a seller's representations and warranties, and specific closing conditions would be meaningless, as a buyer could be required to close over any breach that arose between signing and closing.

Sellers failed to prove that Buyers breached Section 6.04(a).

## III. CONCLUSION

Judgment is entered in favor of Buyers. Buyers are ordered to prepare a form of final order consistent with this decision immediately to permit Sellers a timely appeal, if they choose to pursue one. The court will seek Sellers' position concerning the form of order before entering it.

---

[470] *Akorn*, 2018 WL 4719347, at \*96.